**In re KIDS CREEK PARTNERS, L.P., Debtor.**

**David R. HERZOG, Trustee in Bankruptcy, Plaintiff,**

v.

**LEIGHTON HOLDINGS, LTD., Cecil R. McNab, and Rafael Rios–Rodriguez, Defendants.**

**Bankruptcy No. 94 B 23947.
Adversary No. 95 A 00158.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 23, 1997.

Steve Shamash, David A. Belofsky & Associates, and David R. Herzog, Layfer Cohen & Handelsman, Chicago, IL, for Plaintiff.

Neal L. Wolfe and Janet S. Baer, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Leighton & McNab.

Alan P. Solow, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, for Rios–Rodriguez.

### MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the Chapter 7 Bankruptcy proceeding by Kids Creek Partners, L.P. ("Debtor" or "KCPLP") under Title 11 U.S.C. In it, the Chapter 7 Trustee, David Herzog ("Trustee" or "Plaintiff"), has sued Leighton Holdings, Ltd. ("Leighton"), Cecil R. McNab ("McNab"), Rafael Rios–Rodriguez ("Rios"), and Robin A. Schabes ("Schabes") (collectively "Defendants") seeking equitable subordination of Leighton's secured claim (Count I), recharacterization of Leighton's claim as equity (Count II), breach of contract (Count III), breach by McNab of fiduciary duty (Count IV), breach by Rios of fiduciary duty (Count V), and inducement by McNab of others to breach their fiduciary duty (Count VII). Count VI against Schabes was dismissed by agreement with prejudice on March 8, 1996. After the motion of the remaining Defendants for summary judgment was denied, the case was tried before the Court.

The evidence told a story about how the state of Michigan for nominal consideration turned over valuable state property near Traverse City to parties who were to develop the site. Some financing was obtained and efforts made to sell and develop the property. The price offered was lower than hoped for, too low to meet both financial requirements of the project and also enable payment of a threatened capital gains tax. To avoid that tax, the Debtor's part in the project was aborted, its dissolution announced, and the Debtor placed in bankruptcy. The Chapter 7 Trustee completed the sale and paid off the lender's mortgage from sale proceeds. Plaintiff complains that the project was doomed by the refusal of Leighton as lender to fund the last advance involved in a series of loans. But the evidence showed that the project failed due to mismanagement, breach of contractual obligations owed by Debtor to the lender, a lower offered sale price than was hoped for, and the capital gains tax problem, among other reasons not caused by Defendants. If the final loan advance had been extended, the project still would have failed, and there were ample contractual grounds to deny the final funding. In the end, a most valuable site obtained for nominal consideration and having great potential for different uses and community enhancement was financed to a significant stage, planned, disputed over, bargained for, and maneuvered over by people who laid the groundwork for development, but at last, when Debtor's part in the Project ended, the whole effort had built ... nothing at all.

At the close of Plaintiff's case in chief, Defendants other than Rios[1] moved for partial findings pursuant to Fed.R.Civ.P. 52(c) (applicable pursuant to Fed.R.Bankr.P. 7052). Following argument, the Court then announced from the bench that the motion

---

1. On June 23, 1997, an order was entered approving an agreement between the Plaintiff and Defendant Rios. The agreement provided that, in the event the trial resulted in a judgment against Rios, such judgment would be vacated and voided upon payment by Rios of the lesser of the amount of the judgment or $1,000. Rios' counsel did not appear at trial, and Rios did not participate in the trial except as a witness called by Plaintiff, nor did Rios file a motion for judgment on partial findings on Count V. Defendants Leighton and McNab's Motion for Judgment on partial findings did not include Count V.

would be allowed after Findings of Fact and Conclusions of Law were prepared, and the trial was therefore suspended. The motion of those Defendants is now granted and judgment will be separately entered in their favor pursuant to the following Findings of Fact and Conclusions of Law made and entered under Fed.R.Civ.P. 52(a)

### *Jurisdiction*

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This case is before the Bankruptcy Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409. Core jurisdiction exists for Counts I and II under 28 U.S.C. § 157(b)(2). Jurisdiction over Counts III, IV, and VII is related and non-core, but the parties to those counts have consented to entry of final judgment by the bankruptcy court as to these counts. Jurisdiction over Count V is also non-core. However, Defendant Rios did not consent to entry of final judgment for this Count.

### *FINDINGS OF FACT* [2]

### *The Involved Parties*

1. The Debtor in this Chapter 7 bankruptcy case is Kids Creek Partners Limited Partnership, a Michigan limited partnership. The bankruptcy case arises from an involuntary petition filed on December 5, 1994, pursuant to which an Order for Relief was entered on December 30, 1994. Plaintiff David R. Herzog is the Chapter 7 bankruptcy trustee for the Debtor.

2. Debtor was formed by Carl Groesbeck ("Groesbeck"), an Illinois resident, for the purpose of acquiring and developing a parcel of real estate in Traverse City, Michigan ("Commons Development Project"), commonly referred to as the Grand Traverse Commons ("Commons").

3. The general partner of the Debtor was Kids Creek Development Company ("KCDC"), a Michigan corporation. KCDC

is currently a debtor in a related Chapter 7 bankruptcy case. KCDC's bankruptcy case also arises from an involuntary petition filed on December 5, 1994, pursuant to which an Order for Relief was entered on December 30, 1994. KCDC was a corporation whose common stock was entirely owned by Mainstream Development Corporation ("Mainstream").

4. Mainstream was an Illinois corporation which maintained its principal offices in the Chicago, Illinois area. Mainstream is currently a debtor in a related, Chapter 7 bankruptcy case. Mainstream's bankruptcy case also arises from an involuntary petition filed on December 5, 1994, pursuant to which an order for Relief was entered on December 30, 1994.

5. Groesbeck was the president, director, and holder of the largest number of shares of common stock of Mainstream, the president of KCDC, and one of the limited partners of KCPLP. Groesbeck created all three entities during the last half of 1992. Mainstream and KCDC were incorporated in September 1992 and the Debtor was formed some time after. All three entities were capitalized with the minimum capitalization required by law. Debtor was capitalized in the aggregate amount of $1,000 through two checks, one signed by Andrew McGhee ("McGhee") in the amount of $990, the other signed by Groesbeck in the amount of $10.

6. Groesbeck, McGhee, and Defendants Rios and Schabes were officers and directors of both KCDC and Mainstream. Rios, Schabes, and McGhee were also limited partners in the Debtor. Rios and Schabes are both Chicago, Illinois residents.

7. Defendant Leighton Holdings Ltd. is a Cayman Islands corporation. Defendant McNab is a California resident and a licensed attorney. McNab was and is the investment manager for Leighton. McNab has also identified himself as an attorney for Leighton. McNab was also a 50% shareholder in and CEO of a corporation known as "Del Rey Financial" ("Del Rey"). Del Rey alleg-

---

**2.** Findings of Fact were prepared from the parties' January 16, 1996, stipulation contained in their Joint Pre–Trial Statement; the February 28, 1997, Facts Deemed Established for Trial after summary judgment was denied; and the evidence and testimony presented at trial.

edly facilitated equity and debt participation in real estate projects. McNab testified, but was not a credible witness at trial. He was extremely evasive and answered many questions with "I don't recall." McNab failed to recall some documents which he himself had written. However, despite McNab's lack of candor, part of his testimony was corroborated by other witnesses, documentary evidence, pretrial stipulations of the parties, or by matters found undisputed following denial of Defendants' pretrial motion for summary judgment.

8. Lakeside Partners ("Lakeside") is a California general partnership of which McNab is a general partner, although there exists no written partnership agreement with respect to Lakeside. Lakeside was formed in conjunction with a loan agreement described below as "LASA One." It was formed for the purpose of receiving equity interests in KCPLP and Mainstream.

9. Rios is a Harvard Law School schoolmate and longtime friend of McNab. McNab did not know Groesbeck until Rios introduced them. Rios and McNab refer to each other as "closest" friends. From the time they met in 1981 or 1982, they have spoken regularly, "sometimes every day for weeks at a time." Rios and McNab remained in regular contact with each other throughout the time they were active in the Commons Development Project. Rios acted as the attorney for the Debtor as to matters in Chicago dealing with Leighton prior to 1994, but had been unemployed from spring 1992 until January 21, 1993.

10. Schabes is a friend and business colleague of Rios. Rios met Schabes in late 1986 or 1987 when Rios hired Schabes to work for him at the City of Chicago as a planning coordinator. Rios had been Schabes' supervisor, but Schabes had more planning experience than Rios. On or about September 16, 1992, Rios contacted Schabes and told her about his potential involvement in the Commons Development Project. In his initial discussions with Groesbeck, Rios told Groesbeck that he intended to work with Schabes on the Project. In fact, Rios insisted that Schabes had to participate. Schabes did not know Groesbeck until Rios introduced them.

11. Richard R. Murray ("Murray") is an Illinois resident, an attorney licensed to practice in Illinois, and the president and sole shareholder of Ross Development Company ("Ross"), an Illinois corporation.

### The Project

12. This case involves efforts by a number of persons and entities to develop or redevelop approximately 450 acres of land (the "Project Site" or "Commons") originally owned by the State of Michigan together with the buildings and other improvements thereon, located in Traverse City and Garfield Township, Michigan (the "Project"). The Project Site was once the site of the Traverse City Regional Psychiatric Hospital.

13. On or about March 26, 1991, the City of Traverse City, Michigan, entered into a consulting agreement with Murray and Ross. In it, Ross agreed to perform certain services in connection with the proposed development of the Project Site, including the making of recommendations, developing a plan of action for transferring the properties, advising on the appropriate documents necessary for the transfer, developing a plan to sub-divide or parcel the properties, and locating prospective developers for the project.

14. On or about June 26, 1991, a civic group located in the area of Traverse City, Michigan formed the Grand Traverse Commons Redevelopment Corporation (the "GTCRC") for the purpose of acquiring title to and facilitating the redevelopment of the Project Site. At that time, the Project Site was owned by the State of Michigan. The GTCRC intended to acquire title to the Project Site from the State of Michigan by action of the State legislature.

15. Groesbeck learned of the Project during the Spring of 1992, while he was employed by Baldwin Development Company ("Baldwin"), which was then engaged in discussions with Murray and Ross regarding Baldwin's potential role as developer of the Project Site. During the summer of 1992, after Groesbeck had left the employment of Baldwin, discussions started with Murray and Ross regarding Groesbeck's possible selection as developer of the Project Site.

16. At some point in time during the summer or early fall of 1992, Groesbeck and Mainstream together with Murray and Ross started negotiations regarding a joint effort or combined role in development of the Project Site. In the months that followed, they exchanged many letters and proposed agreements purporting to set forth with specificity the respective rights and obligations of the parties. Murray and Groesbeck dispute whether one or more agreements resulted. As described in more detail below, Murray and Ross eventually filed a lawsuit against Groesbeck, KCPLP, Mainstream, and others (the "Murray Litigation") claiming *inter alia* that Groesbeck, Murray, and Ross had formed a joint venture to develop the Project, but that Groesbeck had fraudulently breached their agreement.

17. Also toward the latter part of 1992, Groesbeck, who had been discussing development of the site with GTCRC, submitted to it a proposal for redevelopment of the Project Site. Throughout the fall of 1992, Groesbeck and the entities he controlled continued to negotiate with GTCRC regarding development of the Project Site.

18. On or about September 1, 1992, Groesbeck employed James Adams, an attorney located in Traverse City, Michigan, to serve as developer's counsel in connection with the Project Site. Adams assisted in creation of Mainstream, KCDC, and KCPLP, and he rendered legal services to KCPLP in connection with the negotiation and documentation of the Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents, and Financing Statement that are discussed below.

19. During the late summer and fall of 1992, Mainstream and Groesbeck attempted to identify sources of funding for early phases of the project. Groesbeck attempted to attract both equity investors and lenders for the Commons Development Project.

20. Groesbeck and Rios originally met when Groesbeck was employed by Baldwin and Rios was employed by the City of Chicago. They discussed the Commons Project from time to time during the summer and fall of 1992. On or about September 15, 1992, these two men met at Rios' office. At that meeting, Groesbeck described the proposed development plan for the Commons site. Groesbeck represented that he had already entered into an agreement with people in control of the Commons Development Project and that he needed funding to get things under way. Rios advised Groesbeck to align himself with a big developer because the project seemed "pretty ambitious."

21. The next day, Rios contacted Schabes and told her about his meeting with Groesbeck. On or about September 20, 1992, Rios and Schabes traveled to Traverse City to visit the Project Site. There they met with, among others, Suzanne Antosh, the Chairperson of the GTCRC. Antosh escorted Rios and Schabes on a tour of the Project Site, then the group went to visit Adams' law office.

22. Rios' understanding was that GTCRC would purchase the Commons from the State of Michigan for one dollar and would transfer the property to a developer in return for the developer performing certain obligations under a redevelopment agreement with GTCRC. In addition, any developer would need to successfully perform "pre-development" activities, including urban planning of the Commons, obtaining the appropriate zoning and building permits, analyzing and accounting for traffic, and creating a redevelopment plan consistent with the property.

### Loans and Initial Documents

23. Mainstream and Groesbeck were actively seeking funding for the Project. In this effort, Groesbeck had contacted, among others, Robert C. Camp ("Camp"), a flooring contractor known to Groesbeck. On or about October 26, 1992, Groesbeck sent a letter to Adams, which stated, in part, that:

I made the initial proposal from Kids Creek Partners based upon a preliminary master plan budget of $350,000 and sufficient backing and financial reserve to show the development community a net worth of 1.5–$2,000,000. This came in the form of a "Joint Venture" backing by Robert C. Camp [and others]. . . .

24. Mainstream and Groesbeck borrowed $10,000 from Camp. On November 12, 1992,

Groesbeck documented the loan from Camp by executing on behalf of Mainstream a Promissory Note in favor of Camp, the flooring contractor, in the principal amount of $10,000. The Note provided, in part, that "[h]older makes this note, and other consideration, to be able to participate in the Grand Traverser [sic] Commons Project and derive proportionate benefits thereof as a participant in the development and Limited Partnership established by Maker for same." Groesbeck drafted and signed that note without aid or advice of an attorney.

25. Camp testified that he and Groesbeck also discussed exchanging "sweat equity" for Camp's labor as a flooring contractor. Camp also made a subsequent loan of $5,000 to Groesbeck and Mainstream for the Project, thereby raising to $15,000 the combined principal balance of the Camp loans.

26. Mainstream also obtained $50,000 from a tuckpointing contractor named Thomas Sourlis. On one or more of the checks by which Sourlis funded his payments to Mainstream, he expressly noted that the subject funds were for "Investment." On November 12, 1992, Groesbeck executed, on behalf of both Mainstream and Groesbeck, a Promissory Note payable to Sourlis in the amount of $50,000. The Note provided, in part, that "[h]older makes this note to be able to convert this note into a proportionate share and participate as a Limited Partner in Kid's Creek Partners, Limited Partnership, a Michigan Limited Partnership established by Maker for the GRAND TRAVERSE COMMONS project, and enjoy the benefits thereof as an investor." Once again, Groesbeck drafted and signed this note without aid or advice of an attorney.

27. Both Rios and Groesbeck attempted to obtain other financing for the Commons Development Project but to no avail. Other lenders were not interested in the project at that time because it was then a high risk venture. Even Rios then considered the Commons Development Project to be high risk because its success at that time was still contingent on a number of factors, including whether the Michigan Legislature would authorize a transfer of the Commons real estate to GTCRC and whether the proposed redevelopment plan would be accepted by the GTCRC.

28. Another potential source of funds to which Groesbeck began to look was McNab or an entity which McNab represented such as Leighton (the entity which subsequently made substantial loans to KCPLP). Rios knew in the summer of 1992 that McNab had authority to place financing for Leighton.

29. On or about November 1, 1992, Rios, Schabes and Mainstream mailed a "Grand Traverse Commons Redevelopment Project Summary" to McNab, in order to induce Leighton to provide funding. The Project Summary described participants in the project. It listed Groesbeck as project director and McGhee as director of operations. It also listed Camp as the construction manager, the Camp Companies as construction management support, and Murray as the Site Development Manager.

30. On November 24, 1992, Groesbeck sent a letter to Murray which stated, in part, that the letter would "evidence our agreement that you (or Ross Development Company) will have ... an equity interest in the Grand Traverse Commons Project." Groesbeck stated that the percentage of participation would be subject to the requirements of other participants and that "I am in the process of finalizing one or several such financial arrangements, and in all cases your position and credentials have been presented, both as an asset to the project and as a participant in the rewards thereof." Again Groesbeck drafted the document without aid or advice of an attorney.

31. Also on November 24, 1992, Groesbeck, on behalf of Mainstream, executed another Promissory Note, this one payable to the GTCRC for $50,000. However, to provide additional assurances of repayment to the GTCRC, Groesbeck asked Camp to guarantee the note. On November 24, 1992, via facsimile, Camp sent a letter to Groesbeck, in care of James C. Adams. Camp attached a signed guaranty of the $50,000 promissory note from Mainstream to GTCRC. Groesbeck acknowledged his acceptance of the terms set forth in the letter by signing the letter and returning it to Camp. In that

letter, Camp stated that the guaranty was being made conditional upon "[a]n equity position in the project mutually acceptable to Mr. Camp and Carl T. Groesbeck and an agreement again mutually acceptable to Mr. Camp and Carl T. Groesbeck with reference to construction supervision and contractor services shall be negotiated with twenty one (21) days of this letter."

32. On December 1, 1992, Robert Parker, a representative of the GTCRC, sent a letter to Adams, KCPLP's attorney, in which Parker stated that the GTCRC had "met recently for the purpose of reviewing the note, guaranty and personal financial statement of Robert C. Camp." The letter continued that "we are advised that we need a letter from you or some other individual who has knowledge of Mainstream Development Corporation explaining Mainstream Development's role in this matter and that somehow it will benefit from executing this note."

33. On December 2, 1992, Mainstream entered into a Development Services Agreement with Ross, the Murray-controlled entity. Under the Development Services Agreement, Ross was to provide certain consulting services, for which Mainstream was to pay Ross an annual fee of $100,000. Mainstream was also to reimburse Ross for out of pocket expenses. This Development Services Agreement was a two year commitment.

### The Exclusivity Agreement

34. Also on December 2, 1992, the GTCRC entered into an Exclusivity Agreement with KCPLP. The Exclusivity Agreement provided, among other things, that for a period of six months KCPLP would enjoy the exclusive right to propose a redevelopment plan for the Commons Development Project and negotiate with GTCRC concerning the form and content of a formal redevelopment agreement.

35. The Exclusivity Agreement also required, as a condition to entering into any formal redevelopment agreement with GTCRC, that KCPLP would have to provide a financial statement for KCPLP or its affiliates evidencing a net worth of at least four million dollars (the "Affiliation Letter").

36. Under the Exclusivity Agreement, the GTCRC required KCPLP to reimburse GTCRC for all of the latter's expenditures during the term of the Exclusivity Agreement. On December 2, 1992, Mainstream gave GTCRC a Promissory Note, payable to GTCRC, in the principal amount of $50,000. The Note was signed by Groesbeck as president of Mainstream. Groesbeck gave this note to Adams, and Adams delivered it to GTCRC.

37. Murray was then designated the Debtor's "Project Representative" who was to be agent for the Debtor. Under the Exclusivity Agreement, Murray was to be in continuous contact with all other KCPLP principals, partners, and other team members.

38. Despite the foregoing, KCPLP continued to seek still more funding of which it had great need.

### The Loan and Security Agreement (LASA)

39. McNab was viewed as having the best and perhaps only available access to obtain major financing from Leighton. Investment was then risky because the parties interested in development had not yet acquired title to the Site and no mortgage thereon could yet be given to secure financing. In late December 1992, McNab traveled to Michigan to view the Site and meet with some key players in the project, including Groesbeck and McGhee. Groesbeck met McNab at O'Hare International Airport in Chicago and traveled to Michigan with him.

40. At some point, either on the way from O'Hare to Traverse City or on the return trip, Groesbeck told McNab that Camp and Sourlis had lent money for the purpose of meeting project expenses.

41. McNab asked Groesbeck who Richard Murray was, since Murray was listed on the budgetary projections as a consultant. Groesbeck told him that Murray had been a consultant for GTCRC and was now consulting with KCPLP. Groesbeck also explained to McNab that Murray was the parties' project representative in Traverse City and had a contract to be paid an annual salary of $100,000. LASA One, Exhibit B, provided

for a monthly expense of $8,333 for business consultants. Murray's name was not mentioned in LASA One nor were the number of consultants that this sum covered. Moreover, Groesbeck did not then give McNab copies of the various documents he had given to Camp and Sourlis that appeared to acknowledge their equity participation in the project.

42. While in Michigan at Traverse City, McNab met with Groesbeck and several other people who described the Commons Development Project, showed McNab the Project Site, and also provided him with a copy of the Exclusivity Agreement and financial projections for the Debtor. McNab testified that he made no independent evaluation of whether the necessary legislation would pass or that the project would be able to go forward.

43. At this time Adams suggested to McNab that he go into the project as a venture capitalist and be prepared to throw money away.

44. Murray had expected to meet with McNab during this trip, but they did not meet.

45. At that time, McNab was told that the Debtor had none of its own capital to use to comply with the Exclusivity Agreement. Rios was likewise unaware of any other capital contributions available to enable the Debtor perform under the Exclusivity Agreement.

46. Rios testified that he expected any investment from McNab would be an equity investment. However, both Rios and Groesbeck also testified to their understanding that McNab wanted to make a loan because he was thought to believe that offshore companies are able to loan money to United States business ventures and receive tax-free interest payments, but any equity investment would have adverse tax consequences. Whatever the reason, McNab finally insisted upon making the transaction into a loan with an "equity kicker," that is a loan by Leighton with some side benefit of equity participation by McNab in return for obtaining the loan from Leighton.

47. No representative of Leighton other than McNab approved the loan to KCPLP. He sought no approval from any other representative of Leighton for the loan.

48. Subsequent to the December 1992 meeting, McNab eventually arranged for Leighton to make a group of loans to KCPLP. Those loans are detailed below.

49. On January 4, 1993, Groesbeck sent Rios, by facsimile, a document entitled "Draft Project Bridge Loan Term Sheet," an early draft of KCPLP's proposed terms for the first loan from Leighton.

50. Although Groesbeck himself had not prepared this Draft of the Project Bridge Loan Term Sheet, he reviewed it and wrote on the document his comments and corrections. Among the sections which Groesbeck thereby sought to have amended was the document provision entitled "Loan Term and Repayment" and a separate section of the document entitled "Equity Participation."

51. On January 5, 1993, by facsimile transmission, Rios sent a document to McNab. The first page of that document was a cover letter from Groesbeck to McNab. Attached to the cover letter was a revised draft of the Project Bridge Loan Term Sheet. Rios had revised the document to incorporate the handwritten comments and changes which Groesbeck had made to the January 4, 1993 facsimile from Groesbeck to Rios.

52. On January 6, 1993, Groesbeck and Mainstream amended the November 12, 1992, Sourlis promissory note, increasing the principal amount of that note from $50,000 to $70,000.

53. On January 16, 1993, Groesbeck, McGhee, Rios, and Schabes signed the Mainstream Development Company Shareholders Agreement ("Shareholders Agreement"). The Shareholders Agreement stated that McGhee owned 24.5% (245 shares), Rios and Schabes each owned 12.25% (122.5 shares), and Groesbeck owned the remainder of outstanding shares (510). It also stated that Rios, Schabes, McGhee, and Groesbeck were the directors, and that either Rios or Schabes could veto any amendment to the governing documents of Mainstream and its

subsidiaries and could veto modifications to loan agreements or increases in capital of Mainstream and its subsidiaries. These veto powers were not given to either Groesbeck or McGhee. Furthermore, a 76% super majority was required to authorize certain corporate actions, including the power to borrow more than $100,000 or guaranty any obligation. The effect of the latter provision was that Rios and Schabes could effectively block any such authorization because their combined shares totaled 24.5%.

54. Under the Shareholders Agreement, Mainstream and Groesbeck represented and warranted that "there are no outstanding subscriptions ... options, warrants, rights, convertible securities or other agreements or commitments of any character relating to the issued or unissued capital stock or other securities of the Company obligating the Company to issue any securities of any kind." However, there was no reference therein to provisions in the documents that had been given to Camp, Sourlis, Murray, and Ross.

55. Although the Shareholders Agreement purported to describe the then existing Mainstream share holdings of the parties, none of those parties received stock certificates evidencing their ownership until some time after the execution of that Agreement. Those certificates were eventually delivered, but none of the participants contributed capital in exchange for their stock.

56. On January 19, 1993, Connor sent McNab and Rios each a copy of a draft loan agreement. On or about January 19, 1993, McNab and Groesbeck conferred telephonically regarding terms and conditions of the prospective loan agreement between Leighton and KCPLP. On January 20, 1993, KCPLP, Mainstream, and Groesbeck provided their respective financial statements to Leighton. In those financial statements, KCPLP listed "Loans—0.00" and "Long Term Liabilities—0.00;" Mainstream listed "Loans—57,000.00;" Groesbeck listed "Notes Payable/Banks Sec.—$9,000.00" and "Amounts Payable/Others Uns. $25,000.00."

### LASA One

57. On January 21, 1993, Leighton and KCPLP executed documents in connection with a Loan and Security Agreement ("LASA One"). Groesbeck, in his capacity as president of KCDC, signed the agreement, and McGhee, in his capacity as secretary of KCDC, attested to it. In connection with the negotiation and drafting of LASA One, KCPLP was represented by Rios, and Leighton was represented by Andrew H. Connor ("Connor"), who was, at that time, a partner in the Chicago, Illinois based law firm of Winston & Strawn. Connor represented McNab and Leighton in the transactions with the Debtor. Rios was an active participant in Connor's retention. Connor had been one of the partners for whom Rios had previously worked at Reuben and Proctor. Connor prepared the LASA One documents.

58. LASA One provided for Leighton to loan KCPLP the aggregate principal amount of $350,000, in three separate "advances." Each of these advances, in the respective amounts of $190,500, $79,750, and $79,750, was to be made only upon the satisfaction or waiver of certain conditions. LASA One, Art. I(C). Such conditions specified that no "Event of Default," or "Unmatured Event of Default" occurred or was continuing; that KCPLP's representations were true and correct as of the date of each such advance; that compliance continued with all of the covenants and requirements of the Agreement; and that no material adverse change had occurred in the collateral or financial condition, results of operations, or business of KCPLP.

59. LASA One also provided that Leighton would cause an entity worth at least four million dollars to become affiliated with the Debtor so as to comply with KCPLP's obligations under the Exclusivity Agreement.

60. LASA One further provided for a "Conversion Date" which was the date the loan would convert to a revolving credit facility. Under LASA One, the Conversion Date was the date KCPLP obtained "good and marketable title to the "Real Property" ... and has granted to the Lender a first priority lien covering all the Real Property ... *provided that no 'Unmatured Event of Default' or 'Event of Default' ... has then occurred and is continuing."* LASA One,

Art. I(A) (emphasis added). (A later amendment to LASA One ["LASA Two"] was to change the definition of Conversion Date by removing any reference of conversion to a revolving credit facility.)

61. "Events of Default" [in LASA One] included the following:

(i) If principal of or interest on the Loan, or if any other of the Borrower's Liabilities, is not paid when due; or

(ii) If the Borrower breaches any of the other covenants, terms, conditions or provisions of this Agreement and such breach continues for a period of fifteen (15) days after notice thereof has been given by the Lender to the Borrower; or

(iii) If any representation or warranty of the Borrower contained in this Agreement or in any document or instrument delivered pursuant to this Agreement is untrue or incorrect in any material respect; or

. . .

(v) If the Borrower becomes insolvent or generally fails to pay, or admits in writing its inability to pay, debts as they become due; or the Borrower applies for, consents to or acquiesces in the appointment of a trustee, receiver or other custodian for the Borrower or any property or assets of the Borrower, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for the Borrower or for a substantial part of the property or assets of the Borrower and is not discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of the Borrower and if such case or proceeding is not commenced by the Borrower it is consented to or acquiesced in by the Borrower or remains for 30 days undismissed; or the Borrower takes any corporate action to authorize, or in furtherance of, any of the foregoing; or

(vi) If the Borrower is in default in respect of any other indebtedness of the Borrower aggregating $35,000 or more.

62. The occurrence of an Event of Default entitled Leighton to, among other things, accelerate the entire unpaid amount of KCPLP's obligations to Leighton, refuse to make any future advances under the Agreement, and foreclose on its collateral.

63. The outstanding principal balance of the loan was to bear interest at the rate of 15% per annum (which happened to be the same interest rate as in the Camp and Sourlis notes). However, in event of default, the principal loan balance would bear interest at a higher "default" rate. Interest would be payable monthly in arrears, subject to the right of KCPLP to request that the first six monthly interest payments be added to the unpaid principal amount of the loan. To secure repayment of the loan, KCPLP granted to Leighton a first priority security interest in, among other things, all of KCPLP's accounts, inventory, machinery and equipment, cash, leases, and contract rights.

64. LASA One also contained certain representations and warranties by KCPLP to Leighton including the following:

(v) *Except as disclosed in the financial statements of the Borrower most recently delivered to the Lender pursuant to or in connection with this Agreement, the Borrower has no indebtedness or other liabilities,* other than trade payables arising in the ordinary course of its business;

. . .

(viii) *The financial statements of the Borrower furnished to the Lender prior to the execution* and delivery of this Agreement have been *prepared in accordance with generally accepted accounting principles* consistently applied and *fairly present the financial condition* and results of operations of the Borrower as of and for the period ending on the date as of which such financial statements are presented; and since the dates of such financial statements there has been no material adverse change in the financial condition, results of operations, business or prospects of the Borrower;

(Emphasis added.)

65. LASA One also referred to certain Negative Covenants which KCPLP was obli-

gated to honor. In two of these Negative Covenants (applicable only prior to the Conversion Date) KCPLP agreed not to

(ix) ... pay any compensation to any of Carl T. Groesbeck, Andrew McGhee, Rafael Rios, Robin Schabes or any person or entity which is an "Affiliate," (as such term is hereinafter defined) of [sic] any of them, other than compensation for services actually rendered and not exceeding the amounts of compensation to Carl T. Groesbeck, Andrew McGhee, Rafael Rios and Robin Schabes which are set forth in Exhibit 3 attached hereto (the "Budget"). For purposes hereof, Affiliate means, with respect to any Person, any Person or group acting in concert in respect of the Person in question that, directly or indirectly, controls or is controlled by or is under common control with such Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding the foregoing, neither the Lender nor Lakeside Partners shall be deemed to be an Affiliate of the Borrower, Mainstream or KCDC.

(x) ... permit any of Carl T. Groesbeck, Andrew McGhee, Rafael Rios, Robin Schabes or any person or entity which is an Affiliate of any of them to receive compensation from KCDC or from Mainstream, other than compensation from Mainstream which arises from activities which are unrelated to the Borrower or the Borrower's business and operations.

Such forbidden practices would later become known and referred to by parties involved here as "upstreaming" funds.

66. The loan agreements and the coordinating notes specified due dates for repayment of the principal amount of Leighton's financing. They also required that the principal be repaid sooner if KCPLP were to effectuate a sale of the project site and generate any earnings. In addition, LASA One required the Debtor to provide Leighton with financial information through monthly unaudited financial statements including a balance sheet.

67. LASA One had certain specific conditions to closing of the loan, including an obligation to provide Leighton with an unaudited balance sheet for KCPLP, KCDC, Mainstream, and Groesbeck as of January 15, 1993, certified "as having been prepared in accordance with generally accepted accounting principles consistently and as presenting fairly the financial condition of the person or entity to which such financial statements apply" as well as an unaudited pro forma balance sheet of KCPLP as of February 1, 1993, which was to reflect consummation of the loan transactions. LASA One, Art. I, D(xii).

68. The financial information actually provided to McNab and Leighton included a January 15, 1993, balance sheet for KCPLP; a February 1, 1993, "pro forma" balance sheet for KCPLP; a January 15, 1993, balance sheet for Mainstream; and a February 1, 1993, "pro forma" balance sheet for Mainstream. Groesbeck also provided a personal financial statement. These financial statements were presented to McNab on January 20, 1993.

69. As admitted by Groesbeck's testimony, the foregoing financial statements that were delivered understated actual KCPLP liabilities. Groesbeck testified at trial that he created these financial statements and acknowledged that they contained errors. He admitted that the financial statements were ineptly prepared, and he was wrong to prepare them too quickly. He acknowledged, in effect, that the statements contained errors due to his carelessness.

70. KCPLP's pro forma balance sheet reflected $190,500 in current liabilities for loans. Groesbeck testified that this referred to the Leighton loan. There were no corresponding assets shown on either the KCPLP or Mainstream pro forma balance sheets or balance sheets. Mainstream's balance sheets reflected current liabilities for $57,000 in loans. Roger Dickerson, Mainstream's accountant, testified that this included a loan by Groesbeck and the Camp and Sourlis

loans at least in part. The rest of the obligations were not reflected, and there were no descriptions on these financial statements as to what the $57,000 represented.

71. As part of his repeated "I don't recall" testimony, McNab testified that he does not recall whether he read any of these financial statements before authorizing the first advance under LASA One or whether he ever discussed these financial statements with anyone.

72. Also on January 21, 1993, the parties executed an Amended and Restated Limited Partnership Agreement which was prepared and executed pursuant to LASA One. This agreement was executed by Groesbeck in his capacity as a limited partner in the Debtor and president of KCDC, and by Lakeside. KCPLP issued to Lakeside a 11.67% limited partnership interest in KCPLP; by terms of the agreement between the parties, that interest was not subject to dilution. LASA One also required that Leighton "was to be satisfied" that Rios and Schabes each had been provided a 12.25% equity interest in Mainstream. It is clear that Groesbeck would not have permitted either Rios or Schabes to participate unless Rios had managed to arrange financing. It is also clear that McNab would not have arranged for financing unless Rios was a part of the project.

73. Groesbeck, KCDC, and Mainstream guaranteed the obligations of KCPLP to Leighton under LASA One. As additional security for the loans, Groesbeck was to furnish a mortgage to Leighton on all real property personally owned by him, and Groesbeck and KCDC also assigned to Leighton, as collateral security, any proceeds or benefits they might receive from their respective partnership interests in KCPLP.

74. On January 22, 1993, KCPLP executed and delivered to Leighton a promissory note in the principal amount of $350,000 evidencing the first loan. Leighton conducted no title search to determine the priority of its contemplated mortgage interest, nor did McNab seek an appraisal of the value of Groesbeck's property. Furthermore, although by its terms LASA One required Groesbeck to provide a guaranty of KCPLP's obligations, Leighton did not obtain a credit report on Groesbeck and McNab was unaware of Groesbeck's financial condition. No loan committee for Leighton approved the loans made by Leighton to Debtor; the loan was made entirely on McNab's recommendation.

75. Groesbeck testified that he, McGhee, Rios, and Schabes all received leased company vehicles. As Dickerson testified, the principals also had corporate credit card accounts. These accounts were frequently used by them for personal purchases, and they did not always reimburse KCPLP for such personal purchases.

76. By February 17, 1993, GTCRC had determined that the $50,000 Note from Mainstream and the Camp guarantee might not provide sufficient assurance of replacement of the GTCRC's expenses. Accordingly, GTCRC required that the developer establish a $50,000 cash escrow, in exchange for which the GTCRC would return the Mainstream Promissory Note and Camp guarantee. On February 17, 1993, Adams, an attorney for KCPLP, forwarded a draft Escrow Agreement to Robert Parker, an attorney for GTCRC.

77. On February 18, 1993, the Debtor and Leighton entered into an agreement that amended LASA One by increasing the amount of Leighton's loan to the Debtor by $28,240. To induce Leighton to enter into and in connection with the amended agreement, KCPLP transferred another 1% limited partnership interest in KCPLP to Lakeside, an interest which by its terms was not subject to dilution.

78. On March 4, 1993, Rios sent a letter to McNab requesting Leighton to disburse the second advance under LASA One. Despite the fact that Debtor had not satisfied certain conditions ("milestones") for its funding request, on March 5, 1993, McNab faxed Bermuda Trust instructions to fund the second advance as requested which, after deduction for required fees, resulted in the net advance of $71,675.

79. On April 5, 1993, McGhee sent McNab a letter requesting partial funding of the third advance under LASA One. Even

though Debtor had not satisfied all conditions for the second, let alone third, advance under LASA One, on April 7, 1993, McNab directed Bermuda Trust to wire the requested partial funding of the third advance under LASA One.

80. Also on April 5, 1993, KCPLP and GTCRC entered into an Escrow Agreement under which KCPLP agreed to escrow $50,000 in cash. In exchange, GTCRC agreed to release and return both the $50,000 Promissory Note given by Mainstream and the Camp guarantee of that Promissory Note.

81. In April 1993, after the Escrow Agreement had been executed, KCPLP deposited $50,000 in the escrow account. These funds had been provided to KCPLP by Leighton under the original Loan Agreement. In accordance with its agreement, GTCRC returned to Adams both the Mainstream Promissory Note and the Camp guarantee, the terms of which were at that time still unknown to Leighton. On April 8, 1993, Adams returned to Groesbeck the Promissory Note and Guarantee, together with the November 24, 1992 letter from Camp to Groesbeck which Groesbeck had countersigned.

### The Affiliation Letter and Redevelopment Agreement

82. On April 19, 1993, McNab faxed Rios a letter to Mainstream for the purpose of complying with Leighton's obligation under LASA One and KCPLP's obligation under the Exclusivity Agreement to "cause an entity worth $4 million to become associated with the Borrower" (the "Affiliation Letter"). In this letter, McNab attached an account summary from the Bermuda Trust Company that showed Leighton's cash holdings in excess of $4 million. It was not stated in the letter or financial statement that Leighton was a creditor of KCPLP. This letter represented that Leighton was an "affiliate" of Lakeside. McNab prepared financial statements to accompany the Affiliation Letter. These financial statements listed assets of $1,200,000 in Lakeside Partners Limited Partnership shares. McNab knew this information was going to be transmitted to the GTCRC for the purpose of KCPLP's compliance with the Exclusivity Agreement.

83. On May 5, 1993, Rios sent McNab by fax a draft proposed redevelopment agreement with GTCRC, referencing a possible new $522,000 loan transaction that Rios and McNab had been discussing.

84. On or about May 7, 1993, McNab directed Bermuda Trust to wire $51,203 to KCPLP, representing net proceeds of the final advance under LASA One. To this point the Debtor still had not satisfied some "milestones" that were conditions for the second and third advances.

85. On May 27, 1993, KCPLP and the GTCRC entered into a Redevelopment Agreement. The Redevelopment Agreement provided KCPLP with the right to proceed with redevelopment of the Project Site, as well as the right to acquire certain portions of the Project Site after the Site was acquired by the GTCRC from the State of Michigan.

### LASA Two

86. In June 1993, KCPLP requested that McNab arrange an additional loan from Leighton to KCPLP. On June 17, 1993 the parties entered into a second amended loan agreement ("LASA Two"), which more than doubled the amount originally advanced for the Commons Development Project. LASA Two extended the maturity date of the initial loan ("Loan A," on which $378,000 was due by then) to July 22, 1994, and provided that Leighton would make two more advances to KCPLP in the aggregate amount of $522,000 ("Loan B"). The first advance was payable immediately while the second was to be payable upon satisfaction of certain tasks that were part of the Commons Development Project and upon Leighton being granted a first priority perfected mortgage lien on the owner's interest in the Commons.

87. LASA Two also provided that Lakeside would receive 12.5% of Mainstream's stock. Lakeside would further receive an additional 10.573% of the Debtor's limited partnership shares. Furthermore, pursuant to LASA Two, McNab would receive .846% of the limited partnership shares in the Debtor and 1% of the outstanding stock in Mainstream. The issuance of these shares to

McNab and Lakeside was a condition precedent to funding under LASA Two. In addition, Del Ray, the entity in which McNab had a 50% interest, was to be paid a $22,000 "fee." To further induce Leighton to enter into the Second Amendment and thereby increase the total potential loan amount to $900,000, KCPLP assigned to Leighton all of KCPLP's rights under the Redevelopment Agreement.

88. In connection with LASA Two, KCPLP represented and warranted that KCPLP had no undisclosed indebtedness or other liabilities, other than trade payables arising in the ordinary course of its business; that KCPLP's financial statements were prepared in accordance with generally accepted accounting principles; that KCPLP was in full compliance with all of its covenants under the Loan Agreement; and that there did not then exist any Event of Default or Unmatured Event of Default.

89. KCPLP executed and delivered to Leighton a promissory note in the principal amount of $522,000, evidencing "Loan B." Groesbeck, Mainstream, and KCDC executed a Reaffirmation Agreement under which they reaffirmed their representations, warranties, and guaranties under the Original Loan Agreement, as amended. Groesbeck and KCDC entered into an agreement providing that their existing assignments of partnership interests in KCPLP would secure repayment of "Loan B" as well as "Loan A."

90. On June 17, 1993, McNab directed Bermuda Trust Company to wire $99,675 to KCPLP to fund the first advance under LASA Two.

91. On June 24, 1993, McGhee sent McNab financial statements for Mainstream and the Debtor. These financial statements disclosed that Mainstream had an account receivable of $60,000 and that the Debtor had an account payable of $60,000. These were the first financial statements provided to McNab since execution of LASA One, despite the monthly reporting requirement. McNab does not recall reviewing these financial statements or asking anyone about them.

92. At approximately the same time as LASA Two was executed, the Debtor and GTCRC succeeded in obtaining the Michigan Legislature's approval to convey the Commons to GTCRC in exchange for nominal consideration, so that the real estate could eventually be developed in accordance with the Redevelopment Agreement.

93. On June 30, 1993, the parties executed the First Amendment to the Amended and Restated Partnership Agreement for the Debtor ("First Amended Partnership Agreement"). Pursuant to this Agreement, Rios, Schabes, and McGhee for the first time received limited partnership interests in the Debtor. Lakeside and McNab were also provided with limited partnership interests as specified by LASA Two.

### The Murray Litigation

94. During 1993, another dispute was brewing that was not revealed to McNab and Leighton until late August or early September of that year. On February 9, 1993, at a meeting attended by Murray, Groesbeck and Rios, Murray raised the issue of his alleged equity interest in the project. Murray claimed that Groesbeck had orally agreed to provide either Murray or Ross with an equity interest, but had failed and refused to execute an appropriate written agreement which gave effect to the agreement.

95. In meetings which took place later during February, 1993, Murray offered to settle his or Ross's claims for both an equity interest and also all claims for asserted breach of the Development Services Agreement in return for a total payment of $358,096. That offer assumed a value of $190,000 for his claimed equity interest in the Project.

96. Settlement negotiations between Murray and Groesbeck continued. On March 3, 1993, with authority from Groesbeck, Rios sent a memorandum to Murray which contained a settlement offer with respect to both the contract issue and the claim for equity interest. In that memorandum, Mainstream and KCPLP offered to pay Murray or Ross $8,333 a month through May 15, 1993, to settle the contract claims (the same amount listed under LASA One as a monthly expense for business consultants. See Finding ¶ 40). In lieu of giving Murray or Ross a partnership interest in KCPLP to settle the

equity issue, Mainstream and KCPLP offered to give Murray or Ross a promissory note from Mainstream, guaranteed by Groesbeck, in the principal amount of $171,428.55.

97. On or about May 19, 1993, on behalf of both Ross and Murray, Michael B. Solow of the Chicago based law firm of Hopkins & Sutter sent a letter to Groesbeck and Rios threatening to file a lawsuit by his clients against KCPLP, KCDC, Mainstream, Groesbeck, and Rios unless "we can commence good faith negotiations immediately." To this letter, Solow attached a copy of a draft 25–page Cook County Circuit Court complaint in which Solow threatened to file absent settlement. The draft complaint alleged, among other things, that Mainstream and Groesbeck "agreed, for valuable consideration, to become, and are, joint venturers with Ross and Murray." It sought entry of judgment "[a]warding them, as damages, an amount to be determined at trial equal to the value of a 50% interest in the Project, believed to be approximately $1.75 million," and also sought entry of judgment for damages in an amount not less than $91,824.12 for alleged breaches of the Development Services Agreement. The threatened Complaint also alleged, among other things, that Murray and Ross owned a 50% equity interest in KCPLP and KCDC.

98. On May 25, 1993, on behalf of Groesbeck and Rios, William G. Schopf, Jr. of Schopf & Weiss responded to Solow's letter, asking to review additional documents and offering to meet with Solow and his clients.

99. The dispute between Murray and Groesbeck continued. Murray refused to settle his claims on terms offered to him. On August 12, 1993, his suit was filed (the "Murray Litigation"). Leighton and McNab were among nine persons named as "Respondents in Discovery." In the Complaint as filed, Ross and Murray alleged, *inter alia,* that they had entered into a joint venture agreement with Mainstream and/or Groesbeck to develop the Project Site; that Mainstream and Groesbeck had failed to pay Ross and Murray amounts owing under the December 2, 1992, Development Services Agreement between Ross and Mainstream; that Mainstream and Groesbeck had breached their

fiduciary duties to Ross and Murray by failing to grant Ross and Murray an ownership interest in KCDC, KCPLP and "the Project;" and that Groesbeck and Mainstream had breached their obligations under the joint venture agreement with Ross and Murray. Count IV alleged that Groesbeck and Mainstream had defrauded Ross and Murray by misleading Ross and Murray into continuing to work for the Project. These counts sought a judgment for money damages and, in addition, a judicial declaration that Ross and Murray owned an interest in KCDC and, through it, KCPLP. Count V alleged that Mainstream, KCDC and KCPLP had breached the Development Services Agreement by failing to pay Ross consulting fees provided for thereunder. This Count sought damages in excess of $91,824.12.

100. A portion of the Complaint which brought claims against the "Respondents in Discovery" alleged that these persons and entities, including Leighton and McNab, "may possess evidence that is relevant and material in determining the identities of persons and entities who should properly be made party defendants in this cause and that is otherwise relevant and material to the just disposition hereof."

101. McNab received a copy of the Murray Complaint in early September 1993.

### Additional Funding Efforts and the Master Lease

102. Prior to September 30, 1993, the Debtor attempted to sponsor a private placement offering ("PPO") to raise $2 million in equity. The documents which KCPLP considered submitting to investors to obtain this financing were prepared, at least in part, by Frank McGhee, Andrew McGhee's brother. Frank McGhee was paid a consulting fee for preparing these documents. However, no equity was raised through this effort.

103. On September 3, 1993, KCPLP and the GTCRC entered into a "Master Lease" for the Commons which was to take effect once GTCRC received title to the project sites from the State of Michigan. The Master Lease also provided that the leasehold interest could be collaterally assigned to a

third party. Although the Master Lease was executed on September 3, 1993, GTCRC did not receive title to the Site until after November 15, and therefore Leighton remained unprotected by any mortgage on the Site to secure its loans until then.

104. On or about November 15, 1993, the Michigan legislature enacted legislation transferring ownership of the Project Site to the GTCRC.

### LASA Three

105. On September 30, 1993, the parties entered into a third amended loan and security agreement ("LASA Three"), which further amended the previous loan agreements. This agreement accelerated the timetable for funding a portion of the second advance granted under LASA Two so that advance could be made even though a mortgage on the Commons project had not yet been approved. As a condition of this funding, LASA Three required that Lakeside's interest in Mainstream be increased to 13% and that Lakeside's total interest in the Debtor be increased to a total of 24%.

106. On September 30, 1993, McNab directed Bermuda Trust to wire $79,725 to KCPLP.

### LASA Four

107. On November 2, 1993, the parties entered into the fourth and final amended loan and security agreement ("LASA Four"). Pursuant to this agreement, Leighton was to lend an additional $2 million ("Loan C") to the Debtor in periodic advances according to a specified schedule. This brought Leighton's total lending commitment to $2.9 million. From each of the foregoing advances, McNab was to receive a 4% finder's fee, up to a total of $80,000. The agreement further provided for Debtor to repay the obligation in one year, except that any profits from a land sale would have to be first applied to retire the Leighton debt, regardless of whether the loan was otherwise due.

108. Both LASA Three and LASA Four expressly reference the Murray Litigation.

109. On November 1, 1993, KCPLP executed and delivered to Leighton a promissory note in the principal amount of $2 million, evidencing Loan C. On November 2, 1993, McNab authorized Leighton to advance $322,000 to KCPLP pursuant to LASA Three.

110. After LASA Four and related documents had been executed, McNab owned 0.76% of the limited partnership interests in KCPLP and 1% of the stock of Mainstream, and Lakeside owned 32.88% of the limited partnership interests in KCPLP and 13% of the stock of Mainstream.

111. On November 1, 1993, McNab directed that Bermuda Trust wire $518,625 to KCPLP, which was done.

112. On November 30, 1993, McNab authorized Leighton to advance an additional $198,000 pursuant to LASA Four.

113. Leighton was not provided with financial statements for November 1993, as was required by LASA One.

### Appraisals

114. On December 1, 1993, Jack Burns, an appraiser commissioned jointly by KCPLP, Munson, and the County appraised an approximately 50 acre parcel of land (the "Medical Campus") located on the Project Site at a value of $6,300,000 for the vacant land site ready for development. McNab was aware of this appraisal. However, Jack Burns subsequently changed his appraisal after receiving different criteria upon which to base it. Using the revised criteria, Burns appraised the underlying value of the same land to be $2 million. Mr. Burns was not called to give expert testimony as to the value of the Project Site land, nor was any other expert called to testify to such an opinion, so the value of the Site land at any time cannot be fixed in these Findings based on expert testimony.

115. At approximately the same time, Debtor commissioned Kenneth Leventhal and Company to do an appraisal of the Medical Campus. The resulting appraisal report, supervised in some parts by Frank Pons of the Leventhal firm, suggested a value range of the Site between 5.8 and 6.8 million dollars. McNab was aware of this appraisal. However, at trial Pons testified that he could

not form and did not have an opinion as to value of the Site.

### The Mortgage

116. On December 9, 1993, pursuant to agreements with Leighton, Debtor granted Leighton a Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents, and Financing Statement (the "Mortgage") on its interest in the Commons. The Mortgage was recorded on December 14, 1993. GTCRC executed a "joinder agreement" with respect to the mortgage. The "joinder agreement" provided that the "[m]ortgagee, or any purchaser at the foreclosure sale will take title to the Premises subject in all respects to: (i) the Redevelopment Agreement with respect to compliance with applicable zoning; and (ii) the ARP and the Act 250 Development Plan ... and will assume the financial and insurance obligations of the Mortgagor under the Master Lease...."

117. Because Events of Default and Unmatured Events of Default were in existence at this time, the Conversion Date did not occur. *See* Finding Nos. 60, 61, 62.

118. Also on December 14, 1993, McGhee faxed McNab a request for the final advance under both LASA Two and LASA Three and the second advance under LASA Four. On December 15, 1993, McNab directed Leighton's bank to wire $559,943 to the Debtor to comply with the funding request made by McGhee the previous day.

119. Pursuant to LASA One and amendments thereto, Leighton had by the end of 1993 funded loans to KCPLP totaling, in the aggregate, $1,692,740 (not including accrued interest, costs and fees).

120. At this point, Loan C under LASA Four was the only loan not yet funded.

121. The obligation to advance Loan C was dependant on there being no events of default or unmatured events of default, unless the lender waived any such events.

122. Had Loan C been funded, the proceeds would have been barely enough to repay Loans A and B and the interest due thereon, leaving little or nothing for operating expenses. No evidence was presented at trial that any other financing was available for operating expenses or to repay Loan C. In short, had Loan C been advanced, KCPLP would still have been out of funds unless the Project were sold for an adequate price. Thus, the efforts to sell which went on during 1993 and 1994 were critical to KCPLP's interest and success.

### The Defaults

123. On December 22, 1993, Ross and Murray filed an Amended Complaint in the Circuit Court of Cook County, Illinois, naming the following individuals and entities, among others, as defendants: Groesbeck, Mainstream, KCDC, KCPLP, Rios, Adams, Camp, McGhee, Schabes, Leighton, and McNab. Murray and Ross alleged that Groesbeck and Mainstream had breached a number of contracts and committed a number of torts. In addition, Ross and Murray alleged that Groesbeck had used funds provided by Leighton to purchase a residence for Groesbeck and his wife in Oak Park, Illinois. This claim had not been asserted in Murray's original Complaint.

124. During this time period, representatives of Mainstream, KCPLP, and KCDC contacted various of the defendants and "Respondents in Discovery" named in the Murray lawsuit to assure them that the lawsuit was frivolous. In addition, Mainstream, KCPLP, and KCDC offered to file special appearances on behalf of a number of those defendants, and then to move to have claims against those defendants dismissed on the grounds that those defendants had no interest in the Project Site or KCPLP, Mainstream or KCDC. Those defendants were asked to execute affidavits swearing that they had no interest in any of the three entities or in the Project Site.

125. One evening, during late-December 1993, Rios answered the telephone at Mainstream's offices in Chicago. The caller identified himself as Robert Camp and asked to speak to Groesbeck. Rios informed Camp that Groesbeck was not in the office. Rios and Camp commenced discussions regarding the lawsuit, and Rios offered to have KCPLP, Mainstream, and KCDC file a spe-

cial appearance on behalf of Camp and move to dismiss the claim against Camp. Rios indicated that all he needed from Camp was an affidavit swearing that the latter had no ownership interest in KCPLP, Mainstream, KCDC, or the Project Site.

126. Shortly thereafter, Rios called a meeting with Schabes, Groesbeck, and McGhee. He informed them what he had learned, and that he believed Leighton should be notified of Camp's claims. McGhee lost his temper and said that the lender should not be told.

127. A few days later, McNab came to Chicago and visited Mainstream's offices for the first time. This was the first time that McNab had actually met Andrew Connor, the Chicago attorney who had been representing Leighton and him in the Murray litigation. McNab was concerned about that lawsuit and wanted to meet with the principals of Mainstream and KCPLP.

128. Dickerson testified that, during McNab's visit, McNab asked if there would be any distribution of profits from the possible land sale if efforts to sell proved successful. *See* Findings ¶¶ 156 et seq.

129. On or about December 30, 1993, one week after Winston & Strawn attorneys had begun to work on a proposed sale of a portion of the Commons, Connor sent a letter to Rios and McNab seeking consent to Winston & Strawn's representation of KCPLP in the sale. McNab insisted upon reserving the right to use Winston & Strawn, his and Leighton's attorneys, in the event Leighton were to sue the Debtor.

130. On December 31, 1993, McGhee sent McNab checks totaling $25,319, which represented loan interest payments. In addition, McGhee sent McNab a letter requesting $268,400, which represented the "January 1, 1994 scheduled funding (gross) of the $2M private placement funding (Loan C)."

131. On January 5, 1994, McNab directed that Bermuda Trust wire $32,896 to his own account as payment of loan fees on the December 15, 1993, transfers.

132. Prior to the end of 1993, KCPLP was current on payments to its creditors including Leighton to whom it had made interest payments due before then on the loans.

133. In addition, prior to the end of 1993, Leighton did not press for strict enforcement of all aspects of the loan agreements. Leighton had made loan disbursements pursuant to requests by Groesbeck or McGhee despite non-performance of some requirements of those agreements. However, such disbursements did not impliedly or expressly waive any failure by KCPLP to provide financial statements for months prior to December 1993, nor did they remove or waive any of the negative covenants.

### The Draft Default Letter

134. On January 10, 1994, Leighton's attorney, Andrew Connor, met with Groesbeck, McGhee, Rios, and Schabes at Mainstream's offices in Chicago, and Connor hand-delivered a letter, in draft form ("draft default letter"), which stated:

> It has come to our attention that the following Events of Default have occurred and are continuing under the Loan and Security Agreement between Kids Creek Partners and Leighton Holdings Ltd.:
>
> 1. Robert Camp claims he is owed $_____ pursuant to agreements with Carl Groesbeck dated _____ under which, among other things, he claims he also has a right to an interest in the Grand Traverse County, MI project (the "Project"). This is a liability which predates the Loan Agreement but has never been disclosed to us, the effect of which is that the representations and warranties set forth in Article IV, Sections A(ii), A(v) and A(viii) of the Loan Agreement, as well as the representations in the Second, Third and Fourth Amendments to the Loan Agreement, were when made and continue to be materially false. In our view, failure to disclose Mr. Camp's claim was and continues to be fraudulent, since there is no question that Carl Groesbeck knew of it.
>
> 2. Mr. Rick Murray's pending threat of litigation based upon his claim that he is entitled to an equity interest in the Project has not been disclosed to us as of

June 17, 1993 when the Second Amendment was executed and Loan B was advanced, although it was then known to Kids Creek (which, in fact, had received a draft of the complaint in May, 1993). This was a material breach of the representations and warranties contained in the Second Amendment, an Event of Default under Article VI, Section A(iii). In our view, this too was fraudulent.

3. The Murray litigation, which was filed after the Second Amendment was entered and Loan B funded, remains undismissed more than 30 days after we indicated verbally to you that we believe it is likely to materially and adversely affect Kids Creek Partners. This is an Event of Default under Article VI, Section A(vii) of the Loan Agreement. (We note that we had been led to believe that this litigation would be modified so as to limit Mr. Murray's claims to Carl Groesbeck and Mainstream Development Company. Instead, we find that in December, 1993, Murray's Complaint was amended to add Cecil McNab and Lakeside Partners as additional parties.)

4. The negative covenants contained in Article V, Sections A(ix), A(x) and A(xi) appear to have been violated in that Kids Creek Partners has made payments to Mainstream Development Company, Carl Groesbeck, Andrew McGhee, Rafael Rios and Robin Schabes in excess of the amounts permitted thereby. In addition, Kids Creek Partners has expended considerable sums in defending the Murray litigation, which we believe to properly be the responsibility of Carl Groesbeck, since the actions complained of therein were taken in his personal capacity, not on behalf of Kids Creek Partners. Such payments should be viewed as advances to Mr. Groesbeck in excess of permitted amounts.

The existence of the foregoing Events of Default raise grave concerns on our part. The first three arise from Carl Groesbeck's activities prior to the time when Leighton Holdings became Kids Creek's lender and constitute fraudulent misrepresentation. (We believe that the failure to properly disclose these matters is also a violation of state and federal securities laws and may constitute criminal misrepresentation.) Knowledge of the existence of these claims would certainly have influenced our decision to become Kids Creek's lender, as well as the decisions of Lakeside Partners and Cecil McNab to become partners of Kids Creek. The nature of Mr. Camp's claim and Mr. Murray's claim also lead us to wonder how many other such claims may exist and as yet not disclosed to us.

The fourth item appears to arise from a lack of financial and accounting controls, or possibly an intentional disregard for covenants which were given as a material inducement to Leighton Holdings. Those covenants were required by us because it was an agreed aspect of our becoming Kids Creek's lender that proceeds of our loans be used primarily to fund non-insider costs and expenses of the Project. It was of critical importance to our credit decision that the insiders, Messrs. Groesbeck, McGhee and Rios and Ms. Schabes, invest "sweat equity" so that Kids Creek would be able to pay its outside payables.

135. The draft default letter did not assert Groesbeck's failure to provide financial statements for KCPLP as an Event of Default.

136. The draft default letter stated in effect that Leighton could, as a result of the asserted defaults, accelerate the debt, but invited proposals to correct the defaults and protect Leighton in the future. The letter also stated that Leighton was suspending its commitment to fund further advances because of the defaults. After showing the letter to the parties and allowing them to read and discuss it, Connor withdrew the draft and left with it. The draft default letter was thereby used as a warning and a basis for discussion, but not actually served.

137. At the January 10, 1994, meeting, Connor learned that, in addition to the claims of Camp and Murray, Sourlis also claimed to be owed $100,000 with respect to the Project under a promissory note executed by Groesbeck and Mainstream which predated the Original Loan Agreement and which granted

to Sourlis the right to convert the indebtedness evidenced thereby into equity in Groesbeck's development of the Project Site. Leighton was thereafter provided with a copy of the Sourlis note.

138. Although the draft default notice alleged as an Event of Default that the Murray litigation remained undismissed after oral notice by Leighton, all notices under the Loan agreement were to be made in writing. As Leighton had not delivered written notice complaining of the Murray litigation 30 days prior to issuance of the draft default letter, paragraph three of the draft default letter did not create an actual Event of Default.

139. Groesbeck also testified that, at the meeting regarding the draft default letter, Connor told him that it would "go a long way" with McNab if the principals of KCPLP redistributed the shares of Mainstream in the same proportions as KCPLP.

### Negotiations between the Parties

140. On January 11, 1994, Groesbeck and Rios contacted John Hudson, an attorney who formerly worked with Rios. Hudson testified that at that time he felt the alleged defaults were technical defaults and misunderstandings. He felt an appropriate course of action would be to work with Leighton on curing the defaults rather then attempting to litigate the matter on KCPLP's limited funds.

141. On January 14, 1994, Groesbeck telephoned McNab to discuss the dispute. During that conversation, Groesbeck claims that McNab told him Leighton would foreclose unless Groesbeck turned over control of KCPLP to McNab and Rios. (However, this testimony was not corroborated by documentation. Further, during Groesbeck's deposition he stated that he had only spoken with McNab on four occasions, all of which were prior to 1994. Therefore, the credibility of this particular testimony by Groesbeck is doubtful.)

142. On January 20, 1994, ten days after Connor showed the draft default letter, Groesbeck sent McNab a four page letter and attachments that contained a summary of his proposal to repair the parties' relationship.

Groesbeck informed McNab that the KCPLP borrowings would be used to fund the legal defense of the Murray lawsuit. The letter also addressed McNab's growing concern about Groesbeck's leadership by proposing to reorganize the "internal management structure to go to a vertical management system...." The letter further proposed to require joint signatures on all bank accounts for all checks over $500, with the signature of either Rios or Schabes being required, and to change the by-laws so that contracts or commitments that required a potential expenditure of $1,000 or more would require the signatures of either Rios or Schabes to be valid. This letter also contained a promise to prevent the practice of upstreaming funds from KCPLP to Mainstream and its principals. See Findings ¶ 65. On January 20, 1994, the Debtor sent McNab a similar letter to that sent by Groesbeck.

143. Hudson acknowledged in his testimony that the practice of upstreaming continued after January 20, 1994, although Roger Dickerson (the accountant for Mainstream) testified that the technique of upstreaming did not result in any cost to KCPLP except wire transfer fees.

144. Early in 1994, Groesbeck sent McNab a letter with a January 28, 1994, Mainstream Management Structure and Reorganization proposal which contemplated Rios becoming CEO and executive vice president of KCDC.

145. On February 1, 1994, Connor, on behalf of Leighton, sent Groesbeck a letter agreeing to some of Groesbeck's proposals, specifying certain requirements for financial controls and reporting, and suggesting that the structure of KCPLP be shifted from Mainstream to "individuals" (McGhee, Groesbeck, Rios, Schabes, McNab, and Lakeside each holding a 161/2 interest). Among McNab's reasons for this shift was that Groesbeck and Mainstream appeared to have no business focus.

146. On February 2, 1994, McGhee sent McNab a letter enclosing two interest payments and sent McNab a $12,000 check representing payment for services for January and February 1994. McNab subsequently returned $3,000 as an overpayment.

147. On February 7, 1994, the Debtor's attorney sent Connor a letter in response to Leighton's proposals outlined in Connor's February 1, 1994, letter. This response attempted to explain the process by which and the reasons why Mainstream had been paying the Debtor's expenses using funds of the Debtor, and why this arrangement was beneficial to all. Furthermore, the letter stated that all personal property purchased with Leighton's funds would be pledged as security for the Leighton loans. The letter affirmed the parties' prior agreement that certain transactions would require the authorization of both Rios and Schabes. The letter reflected disagreement, however, over Leighton's request for restructuring the ownership of the Kids Creek Entities, and suggested that the other remaining proposals made were sufficient to address any legitimate concerns of Leighton concerning management. In support of this, the letter asserted that Leighton already appeared to be over secured. The letter further noted that, despite the recent problems with Leighton, the Debtor had continued work on the Commons Development Project by drafting a district plan for zoning approval during that period.

148. Hudson had a conference telephone call with Connor, McNab, Groesbeck, and Mike Roberts on or about February of 1996. Mike Roberts was an attorney retained as corporate counsel for the Kids Creek entities and Groesbeck. During this call, McNab asked to become a fifth director on the board of either KCDC or Mainstream, but Groesbeck did not consent to this.

149. In March, 1994, the Debtor missed payment of its interest payment due to Leighton, the first such payment it defaulted on. Debtor did not subsequently service its obligations to pay interest on the loans.

150. On March 14, 1994, Groesbeck faxed a draft letter to Connor, attorney for Leighton. In the draft letter, which was addressed to Leighton, Groesbeck acknowledged that KCPLP was in default under certain provisions of the loan agreements and

might default other provisions in the future. The document also attempted to address some, but not all, of Leighton's concerns.

### *Formal Default Notice*

151. On May 26, 1994, Leighton served the Debtor with a default notice ("Default Notice") in which Leighton declared on its behalf that the loan balance was accelerated and fully due. McNab was the only representative of Leighton to decide on its behalf to cease funding and foreclose on the loan. The Default Notice listed the following as the events of defaults: (a) *failure to make interest payments due on the loans for March, April, and May 1994; (b) alleged non-disclosure of liabilities to Camp and Sourlis; (c) the fact that the Murray Litigation persisted; (d) the Debtor's failure to provide monthly financial statements;* and (e) the allegation that Mainstream had paid principals' salaries in excess of amount permitted. The first four of those assertions were accurate.[3]

152. Groesbeck hired an attorney, Gary Weintraub ("Weintraub"), to represent him and the Debtor in response to the Default Notice. On June 9, 1993, Weintraub wrote a letter to Connor and McNab in which Weintraub contended that *Leighton was in default under its funding commitments and that the asserted defaults of Debtor had no basis in law or fact.*

153. After June 10, 1994, KCPLP delivered to Leighton a document, the first page of which bore the title "Financial Statements of Kids Creek Partners, L.P." Attached were 78 pages labeled "Kids Creek Partners, L.P. Unaudited Interim Financial Statement" and sheets labeled "Statement of Income and Expense" for various dates between January 31, 1993, and April of 1994.

154. On June 13, 1994, McGhee wrote McNab a "group of letters" requesting that Leighton fund the last remaining scheduled LASA Four advances for February through May 1994, for an aggregate of $939,200. Thereafter, on June 16, 1994, Groesbeck sent McNab and Connor a letter that purported

---

**3.** Leighton never specified the amount of alleged overcompensation paid to Groesbeck, McGhee, Rios, or Schabes, and the evidence presented

was not sufficiently detailed to permit a finding on the asserted overpayment of salaries.

to exercise the Debtor's option under LASA Two to extend that loan's repayment date by six months.

155. Throughout July and August, several letters were exchanged by the parties, but no resolution was reached. As a result, on August 18, 1994, McNab sent Groesbeck a notice of mortgage default and recorded same against the Commons real estate. In late September 1994, Leighton filed a state court complaint seeking to foreclose on its Mortgage. In that suit, Leighton alleged as events of default those listed on the May 26, 1994, notice of default and also the defaults in subsequent months for non-payment of interest (which through August totaled six months of missed interest payments).

### Sale of the Property

156. On March 11, 1993, KCPLP and Munson Medical Center ("Munson") entered into an interim parking lease agreement under which KCPLP would lease a site sufficient to park 650 cars on the Commons property, but this lease was to become operative only when KCPLP acquired rights to the Site land. Munson owned and operated a 315 bed acute care hospital which adjoined the Commons. In connection with any real estate development on Munson's property, it was required under local law to satisfy certain city parking requirements. Munson had insufficient space on its own land to meet those requirements.

157. Munson had for some time been interested in acquiring a portion of the Commons real estate for its immediate use as well as for possible future expansion. Grand Traverse Medical Care Facility ("Medical Care") operated a nursing home on land which sat between Munson and the Commons. Medical Care planned to replace the nursing home with a larger facility. Although both Medical Care and Munson had negotiated individually for the purchase of the Medical Campus, they subsequently joined forces in the negotiation. Medical Care also joined with the County of Grand Traverse ("County") in negotiating for commonly sought objectives.

158. December 22, 1993, through December 24, 1993, Helen Shapiro, a Winston & Strawn attorney working under Connor's direction, collaborated with Rios to draft a possible real estate contract for KCPLP's contemplated Medical Campus sale to Munson and Medical Care.

159. Hudson and Adams continued to work with and for KCPLP in seeking to negotiate and complete a transaction with Munson and Medical Care during the period from April 1994 through late August 1994; but in late August 1994, they resigned because they had not been paid.

160. Thereafter, Groesbeck and McGhee, on behalf of KCPLP, hired yet another attorney, Edward Ruby, to negotiate with Munson and the County. (In October 1994, an agreement with Munson and the County was to be signed in substantially the form which Hudson and Adams had negotiated prior to their resignation. See Finding ¶ 169.)

161. On March 8, 1994, Munson, Medical Care, and the County ("the Purchasers") made their first formal offer to purchase the medical campus for $2 million plus $300,000 of the planning costs for future development of the Site. Purchasers also proposed to absorb demolition and infrastructure costs. Still focused on appraisal reports referred to in earlier Findings herein, Rios believed that this offer was too low.

162. On April 21, 1994, Hudson made a counteroffer seeking $3.65 million on essentially the same terms as contained in the offer plus $320,000 in planning costs. Hudson stated in the counteroffer that KCPLP believed the $3.65 million price to be more reflective of the values involved.

163. On May 2, 1994, the Purchasers responded to Hudson's offer with its amended offer to purchase the project site for $2.5 million plus planning costs.

164. The evidence at trial established that purchasers were motivated buyers, and the Debtor certainly was a motivated seller. Moreover, the prospective buyers had special interests in the property, more so than other possible buyers in the marketplace. Nonetheless, these prospective buyers never made an offer close to the price range that Debtor hoped for and sought to negotiate.

165. On May 16, 1994, KCPLP publicly announced that it would dissolve at the end of the calendar year. Such a dissolution was necessary to avoid a serious problem with capital gains taxes that would otherwise have become due individually from its principals upon sale of the Site because it and they had only a nominal cost basis for capital gains purposes. Only if the sale price had been in the range of KCPLP's offer to sell for $3.65 million would available cash have been sufficient to meet the capital gains tax burden and have working capital left over, but the purchasers never offered much above their May 2 offer. *See* Findings ¶ 169.

166. As John Hudson testified, as a consequence of either absent or insufficient internal planning, capital gains taxes upon the sale of the project site would be based upon an initial acquisition price of $1, the price charged by the State of Michigan when it passed title. As a result, a massive federal capital gains tax could become due. Hudson testified that the only way to avoid this problem in view of the amount of likely sale price was to liquidate KCPLP in the same year as the sale of the Project Site so that all accumulated liabilities could be written off against the sale, thereby reducing or eliminating the capital gains which otherwise would be the obligation of KCPLP individual principals.

167. Zoning approval requisite to the sale was received on May 17, 1994. On May 18, 1994, McNab phoned Rios, and the two spoke for nearly an hour (eight days before the Default Notice was sent on May 26—see Finding ¶ 151).

168. On June 2, 1994, Purchasers sent a letter to KCPLP agreeing to the same terms as its previous offer, but requiring (in light of the announced forthcoming liquidation of KCPLP) that KCPLP relinquish all of its interests in the Commons property under the Redevelopment Agreement and Master Lease and surrender those interests to the GTCRC.

169. On October 13, 1994, the Bankruptcy Trustee signed a contract for the Medical Campus sale with the purchasing parties. The agreement provided for a purchase price of $2.5 million plus reimbursement of $397,-000 in planning costs. In addition, Purchasers agreed to advance $150,000 to KCPLP to pay costs and obligations required to close the transaction. Munson and Medical Care were highly motivated to acquire the site, and bargaining over the sale price was lengthy and at arm's length. The site likely was worth more to Munson and Medical Care than to outside buyers not having the same interests in the Site. Therefore, the foregoing actual purchase price and reimbursements fixed the actual fair cash market value of the Site.

### The Bankruptcy

170. Thereafter, on December 5, 1994, Murray filed involuntary Chapter 7 petitions against the Debtor, Mainstream, and KCDC. On December 12, 1994, Munson and County filed an emergency motion in the bankruptcy court to order appointment of a Chapter 7 trustee so the Medical Campus sale could be completed by the Trustee.

171. On December 15, 1994, Groesbeck and McGhee sent Rios and Schabes a letter which informed them that certain corporate actions had been taken without a meeting and informed them that they were attempting to have the Kids Creek Entities' bankruptcies converted to voluntary Chapter 11 proceedings. On December 21, 1994, Connor, on behalf of McNab and Lakeside, responded that the proposed Chapter 11 petitions would constitute actions outside the scope of Groesbeck and McGhee's authority as shareholders of the debtor.

172. On December 21, 1994, the Trustee filed and served a motion before this Court for authority to complete the Medical Campus sale for a total of $2,874,144. The motion was noticed for December 30, 1994. On December 27, 1994, Groesbeck and McGhee filed a motion that requested additional time to respond to the involuntary bankruptcy petitions while they negotiated with other shareholders regarding a possible voluntary Chapter 11 petition. On December 28, 1994, Rios and Schabes filed with this Court a pleading that opposed the relief sought by Groesbeck and McGhee and argued that Groesbeck and McGhee could not act without

their consent pursuant to the Shareholder's Agreement. On December 30, 1994, the Court entered orders for relief as to the Debtor, Mainstream, and KCDC which indicated the Debtors had filed no response to the involuntary petitions. At that time, the Court also entered an order authorizing the Trustee to sell a portion of the Project Site to Purchasers, with liens and encumbrances to attach to proceeds. Under that same order, the Court directed the Trustee to pay in full the secured claim of Leighton, subject to possible attack by the Trustee on Leighton's secured position.

173. On or about February 15, 1995, the Trustee filed this adversary proceeding.

174. On January 20, 1995, using a portion of the sale proceeds, the Trustee transferred by wire a total of $2,098,469.41 to the accounts of Winston & Strawn for payment to Leighton of its asserted secured claim, including fees due its attorneys to that date for their services. These funds were transferred on condition (among others) that Leighton post a letter of credit to assure repayment to the estate in the event that the Trustee prevailed in this adversary complaint against Leighton. Such letter of credit was posted. In return, the Trustee agreed to imposition of a super priority over remaining sale proceeds in favor of Leighton to cover its claims for additional fees and expenses for defending this case should it prevail herein.

### Additional Findings

175. Because Events of Default and Unmatured Events of Default existed at the time Debtor received the Mortgage, the Conversion Date (and thus the removal of obligations to honor the Negative Covenants) never occurred.

176. Groesbeck was the majority shareholder of Mainstream and KCDC. At all times Groesbeck was in control of those entities as well as the Debtor. The Trustee did not establish by a preponderance of the evidence that McNab controlled Rios or Schabes or their stock in Mainstream.

177. KCPLP's ultimate failure was caused by a number of factors, including the lack of an offer to purchase the Site at a range high enough to fund cash requirements, the threatened capital gains tax obligation that forced dissolution, KCPLP's undercapitalization, the fact that KCPLP was mismanaged as to financial matters, the troublesome documents given out by Groesbeck that clouded ownership, and events of default caused by KCPLP that justified both the threatened default notice of January 10, 1994, and also justified the formal default notice of May 26, 1994.

178. Statements of fact contained in the Conclusions of Law will stand as additional Findings of Fact, and any conclusions of law contained in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409. Core jurisdiction exists for Counts I and II under 28 U.S.C. § 157(b)(2)(O). Jurisdiction over Counts III, IV, and VII is non-core, but related under 28 U.S.C. § 1334(b). However, the parties to those counts have consented to entry of final judgment by the bankruptcy judge pursuant to 28 U.S.C. § 157(c)(1) and (2). *See* Joint Pretrial Statement at tab 3. Jurisdiction over Count V is also non-core and related; however, Defendant Rios has not consented to entry of final judgment on this Count. *Id.* at tab 4.

### Standards for a Judgment on Partial Findings: Fed.R.Civ.P. 52(c)

Fed.R.Civ.P. 52(c) (applicable herein pursuant to Fed. R. Bankr.P. 7052) provides that if during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court can enter a judgment at that time or wait until close of the evidence. The court has the prerogative "to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *International Union of Operating Engineers, Lo-*

*cal Union 103 v. Indiana Const. Corp.*, 13 F.3d 253, 257 (7th Cir.1994) (quoting *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1475 (7th Cir.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993)); *see also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* Civil 2d § 2573.1. The court may even assess the credibility of witnesses. Wright & Miller, *Federal Practice and Procedure,* Civil 2d § 2573.1 pocket part (citing *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454 (D.Kan.1996)). If a Rule 52(c) motion is granted at the close of Plaintiff's evidence, "the court then must give judgment on the merits for the movant and make findings of fact as provided by Rule 52(a)." Wright & Miller, *Federal Practice and Procedure,* Civil 2d § 2573.1.[4]

A motion for judgment on partial findings under Rule 52(c) differs from a motion for a directed verdict in a jury trial. A motion for judgment on partial findings allows the court "to determine the facts and the law and render judgment against the plaintiff or ... decline to render any judgment until the close of all the evidence." *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 555, 110 S.Ct. 1331, 1338, 108 L.Ed.2d 504 (1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). In a motion for a directed verdict, the court may not weigh evidence. Rather, the court must draw all factual inferences in favor of the nonmoving party. *Id.*

■ Moreover, even where (as in this case) summary judgment has been denied before trial because of a material dispute of fact, a motion for judgment on partial findings can still be granted after a plaintiff has put in its case. *LeBeau v. Libbey–Owens–Ford Co.*, 799 F.2d 1152, 1168 (7th Cir.1986) (Eschbach, J. dissenting) (collecting cases), *opinion modified and rehearing denied,* 808 F.2d 1272 (7th Cir.), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987).

■ "[T]he court must take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive." *Patterson v. General Motors Corp.*, 631 F.2d 476, 487 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304, (1981) (discussing 41(b)). Unlike with a motion for directed verdict, the court makes no special inferences in the plaintiff's favor "nor concerns itself with whether the plaintiff has made out a prima facie case. Instead, the court is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Sanders v. General Services Admin.*, 707 F.2d 969, 971 (7th Cir. 1983).

### Count I: Equitable Subordination

The Trustee failed to offer sufficient evidence to support a finding of equitable subordination. Under § 510(c) of the Bankruptcy Code, the court may, after notice and a hearing, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest...." 11 U.S.C. § 510(c). The statute does not set out specific standards to determine when equitable subordination should be ordered. However, the legislative history accompanying § 510(c) indicates that the statute codified existing case law and left to the courts the task of developing the doctrine in the future. *In re Badger Freightways Inc.*, 106 B.R. 971 (Bankr.N.D.Ill.1989); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir.1990). "Subordination depends on a combination of inequitable conduct, unfair advantage to the creditor, and injury to the creditors." *Id.*

■ A Seventh Circuit panel has approved a three-prong test to determine whether eq-

---

4. Prior to 1991, Fed.R.Civ.P. 41(b) provided that a defendant in a case tried without a jury could move for dismissal at the close of the plaintiff's evidence on the ground that upon the facts and the law the plaintiff had not shown any right to relief. The court then could determine the facts and give judgment for the defendant or it could decline to give judgment until the close of all the evidence. Although this portion of Rule 41(b) was removed in 1991, the substance of the procedure is now found in Rule 52(c).

9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* Civil 2d § 2371.

uitable subordination is appropriate. (1) Did the creditor engage in some sort of inequitable misconduct? (2) Did that misconduct result in injury to other creditors or some unfair advantage on the claimant? (3) Would subordination of the debt be inconsistent with other provisions of the Code? *Matter of Vitreous Steel Products Co.,* 911 F.2d 1223, 1237 (7th Cir.), *reh'g denied,* (1990). The inquiry is on a case-by-case basis focusing on fairness to other creditors. *Id.*

However, it has also been held in this Circuit that equitable subordination does not always require that the creditor be found to have engaged in misconduct. *Matter of Virtual Network Services Corp.,* 902 F.2d 1246, 1250 (7th Cir.1990). Where there is no misconduct, however, some other factor must be present which would warrant imposition of equitable subordination (e.g., excessive delay by creditor, general equities of case). *Id.; In re Aluminum Mills Corp.,* 132 B.R. 869, 894 (Bankr.N.D.Ill.1991). Claims may be subordinated to other claims "on a case-by-case basis without requiring in every instance inequitable conduct on the part of the creditor claiming parity among other unsecured general creditors." *Matter of Envirodyne Industries, Inc.,* 79 F.3d 579, 581 (7th Cir.1996), *cert. denied, Ryckman v. Envirodyne Industries, Inc.,* —— U.S. ——, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). The Seventh Circuit has adopted a flexible approach "in which a court must look to the origin and nature of the unsecured claim and decide whether equity requires that it be subordinated to claims of other general unsecured creditors." *Id.* at 582. However, inequitable conduct still appears to be a requirement where the claims of secured creditors are being challenged. *In re Octagon Roofing,* 141 B.R. 968, 980 (Bankr.N.D.Ill.1992), *aff'd,* 157 B.R. 852 (N.D.Ill.1993) (citing *Aluminum Mills,* 132 B.R. at 894 and cases cited therein).

"Inequitable conduct in commercial life means breach *plus* some advantagetaking...." *Kham & Nate's,* 908 F.2d at 1357 (emphasis in original). However, parties to a contract are not required to do any more than keep their contracts. *Id.* "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of good faith." *Id.* The quality of conduct that will be deemed "inequitable" under § 510(c) depends on the nature of the legal relationship between the debtor and the party whose claim is subject to attack on equitable subordination grounds. *Badger Freightways,* 106 B.R. at 976.

Where the creditor is an insider of the debtor, a lesser standard is used to determine whether subordination is appropriate. While the general standard for non-insider creditors is egregiousness and severe unfairness in relation to the other creditors, the standard for insiders is simple unfairness. *In re Hyperion Enterprises, Inc.,* 158 B.R. 555, 560 (D.R.I.1993). Thus, claims between a debtor and its insiders are to be closely examined, but insider transactions are not per se subject to subordination. *Id.* (citing *Matter of Fabricators, Inc.,* 926 F.2d 1458, 1465, 1467 (5th Cir.1991)). "Such claims are not automatically subordinated because insiders are the persons most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval." *Id.* (citing 3 *Collier in Bankruptcy,* P. 510.05[3a] at 510–14). Where the claimant is an insider, the proponent has the initial burden of presenting material evidence of unfair conduct. The burden of proof then shifts to the claimant to demonstrate "its good faith and the fairness of its conduct." *Hyperion Enterprises,* 158 B.R. at 560; *In re Holywell Corp.,* 913 F.2d 873, 880–81 (11th Cir.1990); *see also Matter of Lemco Gypsum, Inc.,* 911 F.2d 1553, 1557 (11th Cir. 1990), *reh'g denied,* 930 F.2d 925 (11th Cir. 1991) (Table).

Despite his efforts, the Trustee has not established that Leighton was an insider of the Debtor. The Bankruptcy Code defines an insider of a partnership as a "(1) general partner in the debtor; (ii) relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor." 11 U.S.C. § 101(31)(C). The definition of insider does

not include a limited partner who does not otherwise fit the definition of insider. Evidence presented at trial did not establish that Leighton, McNab, or Lakeside had any partnership interests in Debtor; therefore Leighton, McNab, and Lakeside were not insiders of Debtor.

The Trustee correctly points out that the concept of "insider" includes affiliates of the debtor or insider of affiliates of the debtor. 11 U.S.C. § 101(31)(E); *see also In re Kroh Bros. Dev. Co.*, 137 B.R. 332, 334–35 (W.D.Mo.1992). The Bankruptcy Code defines "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor" other than an entity that hold the securities in a fiduciary or agency capacity or solely to secure a debt. 11 U.S.C. § 101(2)(A). The Trustee argues that Mainstream was an insider of Debtor, McNab was an insider of Mainstream, and McNab was an affiliate of Leighton. Thus, he asserts that Leighton was an affiliate of Debtor and an insider.

McNab and Lakeside collectively held only 14% of the stock of Mainstream. The Code provides that an insider of a corporation includes the officers and directors of the corporation, those persons in control of the corporation, a partnership of which the corporation is general partner or a relative of the general partner, officers or directors, or persons in control of the corporation. 11 U.S.C. § 101(31)(B). Neither McNab nor Lakeside were officers or directors of Mainstream. Moreover, it was clear from the evidence at trial that McNab had no control over the Debtor. Groesbeck, McGhee, Rios, and Schabes were the officers of Mainstream and individuals in control of Mainstream. McNab was not part of their usual business meetings and did not participate in their internal decisions. Thus, neither McNab nor Lakeside were insiders of Mainstream or the Debtor.

■ Plaintiff argues that "[f]inancial institutions owe fiduciary duties to borrowers and are insiders when they exercise 'dominion and control' over the borrower." Trustee's Proposed Conclusions ¶ 23. However, Plaintiff did not establish that Leighton had any dominion or control over the Debtor. As Trustee correctly notes, control means the "actual exercise of managerial discretion," or "usurping the power of the debtor's directors and officers to make business decisions." *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1016 (Bankr.N.D.Ill.1996). However, control does not exist simply because bargaining power was greatly skewed in favor of the lender; otherwise this would invariably be true whenever a the lender is on the verge of terminating debtor's operations. *Boyd v. Sachs (In re Auto Specialties Mfg. Co.)*, 153 B.R. 457, 480 (Bankr.W.D.Mich.), *opinion adopted in part*, 153 B.R. 503 (W.D.Mich. 1993). Control must be so overwhelming that there must be, "to some extent, a merger of identity," *Zimmerman v. Central Penn Nat'l Bank (In re Ludwig Honold Mfg. Co., Inc.)*, 46 B.R. 125, 128 (Bankr.E.D.Pa.1985), or "a domination of [the debtor's] will," *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Serv., Inc.)*, 29 B.R. 139, 170 (Bankr. E.D.N.Y.1983).

■ The preponderance of evidence did not demonstrate any such control by McNab or Leighton. While it is true that McNab suggested a change in the structure of KCPLP, Groesbeck refused to acquiesce to McNab's suggestion. Moreover, the facts clearly establish that the dissolution of KCPLP was caused not by Leighton's cessation of funding, but by mismanagement, noncompliance with commitments to the lender, and threat of an overwhelming capital gains tax obligation that individual principals would be responsible to pay.

■ A lender may be an insider if the lender "generally acted as a joint venturer or prospective partner with the debtor rather than an arms-length creditor." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y.1994).

■ However, the Trustee did not establish that Leighton was a joint venturer with Debtor. Evidence was presented through Adams's testimony that he advised McNab that one advancing funds to the Project should do so only as a venture capitalist. However, the weight of evidence did not establish that McNab agreed that Leighton

would become an investor, and the loan documents clearly and precisely established a lending relationship, not ownership.

■ The Trustee argues, because the loan agreements provided for Lakeside and McNab to receive equity interests in Mainstream and KCPLP, that Leighton therefore acted as a joint venturer. However, the evidence at trial showed that these equity interest were given as an "equity kicker" to induce McNab who held control over Leighton's lending to recommend to Leighton the lending of additional funds. McNab himself neither invested nor loaned, and Leighton did not become an owner of equity.

■ Moreover, the mere fact that Leighton loaned funds to KCPLP when KCPLP "needed it" did not establish the Trustee's argument. The evidence clearly showed that one of the principals of Mainstream would write or fax McNab asking for the next loan installment. McNab would then wire Bermuda Trust and request that the loan installment be wired to KCPLP.

■ Trustee also argues that Leighton acted as a joint venturer by assisting in certain project tasks such as the affiliation letter, the escrow agreement, and the contracts for sale of the Medical Campus. However, there was no evidence that Leighton forced itself onto Debtor. Rather, Groesbeck, McGhee or the other principals of Mainstream, and KCPLP requested input. There is nothing unusual in bringing one's lender into efforts to acquire a site for development, and that hardly qualifies evidence of a joint venture. McNab and Leighton had no control over any of the day-to-day affairs of KCPLP or Mainstream, and it was even clear that Leighton and McNab were not even closely monitoring their performance.

■ Undercapitalization can also be considered sufficient conduct to permit equitable subordination. *See In re Daugherty Coal,* 144 B.R. 320, 326 (N.D.W.Va.1992); *Hyperion Enterprises,* 158 B.R. at 560–61. "Proof of undercapitalization of a corporation may lead to equitable subordination if the claimant is an insider who makes a loan to the undercapitalized debtor." *In re Lifschultz Fast Freight Corp.,* 191 B.R. 712, 715

(N.D.Ill.1996); *see also, In re Octagon Roofing,* 157 B.R. 852, 857 (N.D.Ill.1993). This type of misconduct is discussed further below under the discussion of converting debt to equity under the equitable subordination doctrine. However, as discussed above, neither Leighton nor McNab were insiders of the Debtor.

■ As neither Leighton nor McNab were insiders of Debtor, the standard for equitable subordination applicable here is egregiousness and severe unfairness in relation to the other creditors. *Hyperion Enterprises,* 158 B.R. at 560. The Trustee argues that Leighton and McNab's behavior was sufficiently egregious and unfair to meet this standard. However, the evidence offered at trial to support that contention was of insufficient weight to establish persuasively a case for equitable subordination.

The Trustee argues that McNab and Leighton breached their obligations at a time Debtor was especially vulnerable, and then used the costs and delay of obtaining legal enforcement of the contract as levers to a better deal. Trustee's Proposed Conclusions ¶ 16 (citing *Kham & Nate's,* 908 F.2d at 1357). However, the evidence showed that Leighton did not breach, but rather exercised its rights under the contract to cease funding. Debtor itself had breached a number of provisions of the loan agreement, and at the end of December 1993, Murray and Ross filed an amended complaint which made a number of allegations against Groesbeck and which added McNab and Leighton as defendants. Moreover, the evidence tended to show that it was near the end of 1993 when McNab learned of the asserted interests of Camp and Sourlis. The evidence tended to show that McNab and Leighton justifiably felt that Debtor was mismanaged and had deceived them as to asserted ownership interests of third parties, and also as to financial information. They also lost faith in Groesbeck's abilities. Therefore, Leighton's lawyer showed a draft default letter as a warning and basis for discussion which resulted in negotiations. It was only when Debtor announced it was dissolving at the end of 1994 and the venture was clearly in a

state of collapse that Leighton issued a formal notice of default. While it is true that the mortgage was recorded one month prior to the draft notice of default and zoning was approved shortly before the final notice of default, the preponderance of evidence showed that it was the mismanagement of Debtor and its several breaches as well as its imminent dissolution that led to Leighton's final decision to cease of funding.

 Moreover, a lender does not ordinarily owe fiduciary obligations to its borrowers. *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir.), *cert. denied, Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97, (1983); *Matter of Pinetree Partners, Ltd.*, 87 B.R. 481, 489 (Bankr.N.D.Ohio 1988).

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.

*In re Prima Co.*, 98 F.2d 952, 965 (7th Cir. 1938), *cert. denied*, 305 U.S. 658, 59 S.Ct. 357, 83 L.Ed. 426 (1939).

The Trustee argues that Leighton's claims of default were mere pretexts offered for the dishonest and improper purpose of enabling McNab to take control of the project. However, as previously stated, KCPLP was in default under the loan agreement. The Seventh Circuit has stated that parties to a contract are entitled to enforce the terms of the contract to the letter, and a lender may call a loan when due. *Kham & Nate's*, 908 F.2d at 1357; *Prima Co.*, 98 F.2d at 965. Moreover, McNab never obtained control of the project. The Debtor collapsed and was put in bankruptcy after which the Project Site was sold and the mortgage was paid out of sale proceeds.

As the Trustee has not offered sufficient evidence to demonstrate that equitable subordination is warranted, Defendants' motion will be granted as to Count I.

### Count II: Recharacterization of Debt as Equity

 In a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether other requirements of equitable subordination have been satisfied. *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr.N.D.Fla.1990). Although recharacterization of debt as equity is often thought of as a subset of equitable subordination, it is actually a distinct cause of action. *Hyperion Enterprises*, 158 B.R. at 560; *In re Union Meeting Partners*, 160 B.R. 757, 774 (Bankr. E.D.Pa.1993). With equitable subordination, the court generally looks at the misconduct of a creditor as a basis to subordinate its debt where incurring of the debt was inequitable toward the other creditors. *Hyperion Enterprises*, 158 B.R. at 561 (citing *In re Giorgio*, 862 F.2d 933, 939 (1st Cir.1988)). However, "where shareholders have substituted debt for adequate risk capital, their claims are appropriately recast as equity regardless of satisfaction of the other requirements of equitable subordination." *Id.* (citing *Diasonics*, 121 B.R. at 630).

 There are a number of possible factors to consider in determining whether a claim should be recharacterized as equity capital. Most of these criteria have to do with whether the transaction bears the earmarks of an arm's-length commercial lending agreement or not:

> (1) the adequacy of the capital contribution; (2) the ratio of shareholder loans to capital; (3) the amount or degree of shareholder control; (4) the availability of similar loans from outside lenders; and (5) certain other relevant questions such as (a) whether the ultimate financial failure was caused by under-capitalization; (b) whether the note included payment provisions and a fixed maturity date; (c) whether a note or other debt document was executed; (d) whether advances were used to acquire capital assets; and (e) how debt was treated in the business records.

*Union Meeting Partners*, 160 B.R. at 774. "[N]o one fact will result in the determina-

tion that putative loans are actually contributions to capital." *Id.* (citing *Fett v. Moore (In re Fett Roofing and Sheet Metal Co., Inc.),* 438 F.Supp. 726, 731 (E.D.Va.1977), *aff'd,* 605 F.2d 1201 (4th Cir.1979) (Table)). The ultimate issue then is whether the transaction had the substance and character of an equity contribution or of a loan.

Some courts have held that undercapitalization can be established by proof of either of two conditions: (1) insufficient initial capitalization to make a business similar to the debtor a viable business; or (2) inadequate capitalization to obtain equivalent advances from an informed outside lender. *Estes v. N. & D. Properties, Inc. (In re N. & D. Properties, Inc.),* 799 F.2d 726, 733 (11th Cir.1986); *Matter of Mobile Steel Co.,* 563 F.2d 692, 703 (5th Cir.1977); *Daugherty Coal,* 144 B.R. at 325.

■ KCPLP received enough capital to develop plans and efforts described in the Findings of Fact, but was undercapitalized for its ultimate needs. The Kids Creek entities were capitalized with the minimum capitalization required by law. Some financing, although small in proportion to Leighton's loans, was available. Sourlis advanced a total of $70,000 and Camp a total of $15,000. Groesbeck also advanced money to the project. Leighton's advance, while substantial, would have resulted in continued viability only if the Site sold for much more than it did.

■ An important consideration in this analysis is that Debtor's business was unique, unusual, and based on a particular opportunity to obtain rights to develop particular valuable property for no property cost. Moreover, the lending of funds to an undercapitalized debtor alone is by itself insufficient either for a finding of inequitable conduct or to warrant recharacterization of debt. Some other conduct must also be found for undercapitalization to constitute a basis for recharacterizing debt into equity, lest insiders and others shy away from lending to a corporation in financial distress or a venture at higher than usual risk. *See Octagon Roofing,* 157 B.R. at 858, and cases cited.

If supposed loans were to result in proportionate capital ownership, that would constitute evidence supporting reconstitution of debt to equity. But Leighton's loans were not proportionate to shareholdings in Mainstream or limited partnership interests in Debtor. Leighton's final potential loans were to reach $2.9 million, yet Leighton was to receive no interests in either Mainstream or Debtor and never received any such interests. McNab ultimately owned 0.76% of the limited partnership interests in KCPLP and 1% of the stock of Mainstream, and Lakeside owned 32.88% of the limited partnership interests in KCPLP and 13% of the stock of Mainstream. The other equity holders made little or no cash contributions to either entity.

Control is also an important element to consider. However, McNab and Leighton had little if any control over the entities or the project, and the weight of evidence did not demonstrate that McNab or Leighton controlled Rios or Schabes or their equity interests.

■ Moreover, the loan and security agreements contained clear indicia of a loan, and the parties acted in ways consistent with being borrowers and lenders. The agreements contained fixed maturity dates although they were repayable earlier if KCPLP was successful in selling the property. It is true that the loan agreements contained provisions for extension of the due date at the borrower's option; however, the mere fact that the loan terms were flexible does not demonstrate that the loans should be recharacterized. The loan agreements provided for interest at 15%, the same rate as the Sourlis and Camp loans. Until March 1994, KCPLP made interest payments under the loan. LASA One and its amendments were executed along with guarantees, mortgages and promissory notes. Moreover, KCPLP's own business records provided that the debt was a loan.

■ It is true that McNab performed no credit checks on Groesbeck, made no independent investigation into the project, did not closely monitor the Debtor or read the financial statements with which he was provided. It is also true that, had the project failed without KCPLP receiving title to the

property, the loans would have been unsecured and probably not have been repaid in full. However, Groesbeck, KCDC, and Mainstream guaranteed the obligations of KCPLP to Leighton under the Original Loan Agreement. Moreover, Groesbeck was to furnish a mortgage to Leighton on all real property owned by him, and Groesbeck and KCDC assigned to Leighton as collateral security any proceeds or benefits they might receive from their respective partnership interests in KCPLP.

Taken as a whole, the burden of evidence presented by the Trustee does not warrant or support recharacterization of Leighton's loan as equity capital.

### Count III: Breach of Contract

The Trustee failed to establish that Leighton or McNab breached the loan agreement. There are four essential elements for breach of contract: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Nielsen v. United Services Auto. Ass'n*, 244 Ill.App.3d 658, 662, 183 Ill.Dec. 874, 877, 612 N.E.2d 526, 529 (2d Dist.1993) (citation omitted); *see also Servpro Indus., Inc. v. Schmidt*, 905 F.Supp. 475, 479 (N.D.Ill.1995).

The Trustee charges that Leighton breached the contract by refusing to advance Loan C pursuant to LASA Four. The resulting injury was asserted to be a diminished value for the ultimate sale of the Site property. Leighton argues in response that the Debtor failed to perform under the loan agreements, and so it as lender asserted its contractual right to cease funding.

"Generally, a party pleading a cause of action for breach of contract must show its own performance under the contract or an excuse for nonperformance." *Pavey Envelope and Tag Corp. v. Diamond Envelope Corp.*, 271 Ill.App.3d 808, 815, 208 Ill.Dec. 193, 197, 648 N.E.2d 1115, 1119 (2d Dist. 1995) (citing 17A *C.J.S. Contracts* § 538a (1963); *Berry v. Oak Park Hospital*, 256 Ill.App.3d 11, 19, 195 Ill.Dec. 695, 628 N.E.2d 1159 (1st Dist.1993)). The Trustee acknowledges that Debtor breached the loan agreement in some ways, but argues that Leighton waived any and all breaches prior to its refusal to continue funding. Moreover, he contends that, because Leighton supposedly waived all defaults prior to or when making the loan advances that were forthcoming, the "conversion" date occurred on December 14, 1993, the date the mortgage was recorded. Thus, he asserts that certain negative covenants were no longer in effect and Debtor was no longer in breach of those covenants.

Plaintiff urges the position that Leighton waived all the Debtor's breaches by advancing additional funds from time to time. Waiver is the intentional relinquishment of a known right. *Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 104–05, 165 Ill.Dec. 650, 653, 585 N.E.2d 46, 49 (1991) (collecting cases). Such waiver may be made either by express agreement or implied from the party's conduct. *Id.* at 105, 165 Ill.Dec. at 653, 585 N.E.2d at 49 (citations omitted). Under Illinois law which governed relations of the parties involved here, the party claiming waiver has the burden of proof to show a "clear, unequivocal, and decisive act" on the part of the party alleged to have expressly waived its rights. *Id.* (citations omitted). In addition, "[a]n implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Id.* (citing *Kane v. American National Bank & Trust Co.*, 21 Ill.App.3d 1046, 1052, 316 N.E.2d 177 (2d Dist.1974)).

According to the draft default letter, Leighton alleged that KCPLP was in default of the loan agreement for failing to disclose Camp's equity claim, failing to disclose the Murray Litigation prior to LASA Two, issuing false financial statements, and violating the negative covenants by paying excess compensation to Mainstream, Groesbeck, McGhee, Rios, and Schabes. The subsequent formal default notice also charged KCPLP with concealing Sourlis' equity claim, failing to make several months' interest payments, and failure to provide monthly financial statements.

■ The Trustee contends that Leighton waived all these defaults. In this regard, he first argues that Groesbeck disclosed the Camp and Sourlis loans to McNab prior to LASA One, and thereafter Leighton knowingly waived any right to assert a default based upon any lack of knowledge. Although Groesbeck testified that he had fully informed McNab concerning Camp and Sourlis, that was not corroborated by other witnesses. Moreover, other evidence showed that in December 1993, Rios called a meeting with KCPLP's principals and asked that Leighton be informed of Camp's claim, but McGhee said the lender should not be told about that problem. Consequently, there was delay in telling McNab (and through him Leighton) of the Camp and Sourlis claims.

■ The Trustee further argues that Camp and Sourlis never made any equity claims despite the oddly worded and troublesome documents that Groesbeck had drafted and signed without benefit of counsel suggesting that those persons would receive equity in the Project. Thus, it is contended that there was no violation of the loan covenants in this regard. However, regardless of whether Camp or Sourlis actually made an equity claim, the evidence was that Groesbeck gave Sourlis a promissory note which was expressly convertible into a limited partnership interest in KCPLP. While the Camp note did not expressly state that the note was convertible into a limited partnership interest in Debtor, it did provide that Camp would be able to participate in the Project and "derive proportionate benefits thereof as a participant in the development and Limited Partnership" established for the Project. Little wonder that learning of these carelessly worded documents undermined McNab's confidence in Groesbeck. Moreover, while Leighton funded LASAs Three and Four with knowledge of the Murray Litigation, failure to disclose the Murray claims at the time of LASA Two was a violation of that agreement and further contributed to loss of confidence in Groesbeck.

■ The Trustee further argues that the Financial Statements provided to Leighton fully disclosed the practice of upstreaming. This is not correct. The financial statements which Leighton received were incomplete and even partially inaccurate. They showed an obligation for Leighton's loan, but failed to show any corresponding asset on either KCPLP or Mainstream's balance sheet. The financial statements also failed to disclose fully the Camp or Sourlis loans.

■ Moreover, Leighton did not waive any defaults by continuing to advance funds pursuant to the loan agreements. As stated, an implied waiver arises when a party "has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Ryder*, 146 Ill.2d at 105, 165 Ill.Dec. at 653, 585 N.E.2d at 49. Mere continued advancement of money did not show such intent and therefore did not constitute waiver. Leighton did not pursue a course of conduct which evidenced an intention to waive its rights or Debtor's defaults under the loan agreements.

■ It is true that parties to a contract may not "lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Whalen v. K–Mart Corp.*, 166 Ill.App.3d 339, 343, 116 Ill.Dec. 776, 779, 519 N.E.2d 991, 994 (1st Dist.1988) (citing *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980)). Also parties to a contract have the power to waive provisions placed in the contract for their benefit and such a waiver may be established by conduct indicating that strict compliance with the contractual provisions will not be required. *Id.* at 343, 116 Ill.Dec. at 778, 519 N.E.2d at 993 (citing *Harrington v. Kay*, 136 Ill.App.3d 561, 563–64, 91 Ill.Dec. 214, 483 N.E.2d 560 (1st Dist. 1985)).

In *Whalen*, relied on by the Trustee, the plaintiff there had brought an action under the Structural Work Act against the general contractor, the landowners and others. The general contractor and landowners filed a third-party complaint against two subcontractors for contribution and indemnity based upon the subcontractors' failure to procure insurance naming the third-party

plaintiffs as the insured. The subcontractors moved to dismiss the third-party complaint alleging that the insurance requirement was waived. The opinion in *Whalen* agreed, finding that the general contractor drafted the agreements and knew of the insurance requirement and never demanded any proof of insurance prior to the subcontractors completing performance and being paid in full. The issue of the insurance requirement had not been raised until trial. Not only is *Whalen* is distinguishable, but *Whalen* was subsequently limited to its facts. *See Lehman v. IBP, Inc.*, 265 Ill.App.3d 117, 120, 203 Ill.Dec. 113, 116, 639 N.E.2d 152, 155 (3rd Dist.1994) (citing *Batterman v. Consumers Illinois Water*, 261 Ill.App.3d 319, 320, 199 Ill.Dec. 881, 882, 634 N.E.2d 1235, 1236 (3rd Dist.1994)).

> Proof of a voluntary and knowing waiver of a contract provisions should not be assumed from mere inaction under these circumstances. 'Generally, to make out a case of implied waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose.'

*Id.* (citing *Kane*, 21 Ill.App.3d at 1052, 316 N.E.2d at 182). Similarly,

> a vendor who cuts the buyer some slack—even 14 months worth of slack—does not thereby "agree" to forbear indefinitely. The buyer may enjoy the extra breathing room, but when the vendor's patience runs out the buyer must pay up or face the consequences. Were it otherwise, vendors would be inclined to cut off supplies at the first sign of trouble, and buyers as a whole would lose the benefits of lenience.

*Sethness–Greenleaf, Inc. v. Green River Corp.*, 65 F.3d 64, 67 (7th Cir.1995) (citations omitted).

■■■■■ The Trustee also argues that the Debtor's breaches were technical in nature and were not material. He asserts that Leighton and McNab acted in bad faith by using technical defaults to "take advantage" of KCPLP. "Rescinding a contract based upon utterly trivial violations of the contract for the purpose of taking advantage of the other party would be in bad faith." *Original Great American Chocolate Chip Cookie Co.,*

*Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir.), *reh'g denied,* (1992) (citing *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 136–37 (7th Cir.1990)). However, as discussed earlier, a party to a contract is usually entitled to enforce that contract to the letter. Further, the Trustee failed to demonstrate any undue advantage taken on Leighton's part, and KCPLP was in default under multiple provisions of the loan agreement. Some defaults were serious, and all of them demonstrated a lack of capable management and justified loss of lender confidence. Therefore, Leighton did not act in bad faith either when it issued the draft warning default letter or when it served the formal default letter.

■■■■■ The Trustee further contends that Leighton's alleged breach caused significant and foreseeable damages to KCPLP because the breach resulted in a diminished value for the medical campus sale. While McNab was aware that two appraisals had been done on the property, both of which valued the property at or above $6 million, neither of these appraisals was admitted to prove the fair value of the property. Frank Pons, who supervised one of the appraisals, was unable at trial to give an opinion as to value of the property. The other appraisal was done by Jack Burns who subsequently changed his appraisal to $2 million when given alternate criteria. While Rios seemed to feel the property was worth over $6.6 million, Hudson testified that KCPLP felt a fair value for the property was $3.65 million, the price it ultimately sought. Moreover, the evidence at trial showed that KCPLP was a motivated seller, Munson was a motivated buyer, and the final sale price was achieved through hard and lengthy arms-length negotiations. That price was much less than KCPLP was seeking, but the ultimate sale established actual value of the Site property. That value was far too low to meet KCPLP needs and concerns of its principals.

The Trustee argues that, had McNab not caused Leighton to breach its contract with Debtor, Debtor would have been able to obtain a higher price for the property. The property was sold in December 1994 by order of the bankruptcy court. Evidence

showed that Loan C, had it been funded, would have been barely enough to repay Loans A and B and pay operating expenses until other loans were to become due in November 1994. At that time, KCPLP and Mainstream would have been without sufficient funds to continue operating let alone repay Loan C. Even if Loan C had been funded, KCPLP had to sell by the end of 1994 for a price at least in the range of $3.65 million soas to be able to pay the capital gains tax and still have some operating capital. There were no other interested buyers other than Munson who might have offered a higher price, and active marketing efforts ultimately brought the lower selling price that represented the likely fair market value. That value was not affected by circumstances recited in the Findings of Fact or by lack of funding of Loan C. The Trustee failed to prove damages due to diminution in value.

Trustee further argues that Leighton's alleged breach resulted in a loss of $8 million. Under the terms of the sale agreement, KCPLP was required to relinquish all of its interests under the Master Lease and Redevelopment Agreement. The Trustee alleges that with these interests, the remainder of the project was worth more than $8 million. Apart from lack of evidence to support that contention persuasively, under Illinois law, the Debtor's new business had no right to recover lost profits. Future profits are only recoverable where a business has some kind of proven business tract record. *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir.1995) (citing *Hill v. Brown*, 166 Ill. App.3d 867, 117 Ill.Dec. 687, 692, 520 N.E.2d 1038, 1043 (4th Dist.1988)). Groesbeck testified that, although there have been other restorations done on health-care-like properties, this property was unique. In addition, the evidence at trial showed that KCPLP had to dissolve by the end of the year in which the property was sold in order to avoid an overwhelming capital gains obligation faced by its individual principals. Therefore, even if the last loan had been advanced, KCPLP would have liquidated, and there would have been no future profits.

Thus, the Trustee has failed to prove the elements of breach of contract.

### *Count IV: Breach of Fiduciary Duty*

■■■ Count IV alleges that McNab was a fiduciary of the Debtor and breached his fiduciary duty. McNab denies that he was a fiduciary of the Debtor and argues that, even if he were a fiduciary of the Debtor, he breached no duties owed.

The Trustee argues that:

> Using his unfettered ability to exercise [Leighton's] powers as Debtor's secured creditor, McNab ceased funding to Debtor at a critical point in time on pretextual grounds, and demanded control over the project for his own benefit as equity participant. When his demands for control were not met, McNab improperly availed himself of [Leighton's] powers as secured creditor, instituted foreclosure proceedings and forced Debtor's ultimate demise. McNab's breaches of his fiduciary duties destroyed the Debtor and [Mainstream], and McNab is liable to the Estate for the damage he personally caused.

Trustee's Proposed Conclusions ¶ 61.

McNab was a general partner of Lakeside which owned, after LASA Four, 32.88% of the limited partnership interests of the Debtor and 13% of the shares of Mainstream. McNab individually owned .76% of the limited partnership interests of the Debtor and 1% of the shares of Mainstream. Lakeside thus owned the largest limited partnership interest in Debtor, although not the largest interest in Mainstream.

■■■ Illinois law holds that a fiduciary relationship exists between partners. *Mandell v. Centrum Frontier Corp.*, 86 Ill.App.3d 437, 450, 41 Ill.Dec. 323, 333, 407 N.E.2d 821, 831 (1st Dist.1980) (citations omitted). "Partners owe each other the duty to exercise the highest degree of honesty and good faith in their dealings and in the handling of partnership assets." *Id.* (citing *Babray v. Carlino*, 2 Ill.App.3d 241, 276 N.E.2d 435 (1st Dist., 1971)). Similarly, a shareholder of a close corporation owes a duty of loyalty to the corporation and to the other shareholders. *Rexford Rand Corp. v. Ancel*, 58 F.3d

1215 (7th Cir.1995) (citing *Hagshenas v. Gaylord,* 199 Ill.App.3d 60, 145 Ill.Dec. 546, 553, 557 N.E.2d 316, 323 (2d Dist., 1990)). However, limited partners do not per se owe a fiduciary duty to the partnership or to the other partners.

A limited partner is like a shareholder in a corporation. A stockholder, even a dominant or majority stockholder, does not become a fiduciary to other stockholders "by reason of mere ownership of stock." A fiduciary responsibility develops only when the stockholder takes a role in corporate management and acts to dominate, interfere with or mislead other stockholders in exercising their rights.

*In re Villa West Assoc.,* 193 B.R. 587, 593 (D.Kan.1996) (citing *Klebanow v. New York Produce Exchange,* 344 F.2d 294, 297 (2d Cir.1965); *McDaniel v. Painter,* 418 F.2d 545, 547 (10th Cir.1969); *Harman v. Willbern,* 374 F.Supp. 1149, 1158 (D.Kan.1974), *aff'd,* 520 F.2d 1333 (10th Cir.1975)); *see also In re Cencom Cable Income Partners, L.P. Litigation,* 1996 WL 74726, *4 (Del.Ch. Feb. 15, 1996) (relationship between limited partners and general partner is more like corporation to preferred shareholders contractual in nature). A limited partner is normally not involved in managing the partnership so as to incur a fiduciary obligation to the other partners. *Tri–Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg,* 216 Cal.App.3d 1139, 1150, 265 Cal.Rptr. 330, 335 (4th Dist.1989). A limited partner can owe a fiduciary duty where so involved with the partnership as to create fiduciary duties, such as where the limited partner has access to confidential information, *Id.* (citing *Mandell v. Centrum,* 86 Ill.App.3d 437, 41 Ill.Dec. at 327, 333, 407 N.E.2d at 825, 831), or where the limited partner is an insider or in control of the partnership. *Badger Freightways,,* 106 B.R. at 976–77.

McNab was Leighton's agent, a limited partner in Debtor, a shareholder of Mainstream, and a partner in Lakeside. Lakeside was a limited partner in Debtor and a shareholder of Mainstream. The Trustee did not demonstrate that as a shareholder of Mainstream, a limited partner of Debtor, or a partner of Lakeside, McNab took any management role or acted to dominate, interfere with or mislead other equity holders in exercising their rights. The evidence showed that Groesbeck alone or with McGhee controlled and dominated the entities to the point of sometimes not including Rios and Schabes in decision-making. Indeed, at one point Groesbeck canceled their project-related credit cards without prior notice to them.

KCPLP was in default under numerous provisions of the loan agreement when Leighton ceased funding. The only evidence that McNab made any "demand" for control was Groesbeck's uncorroborated testimony which, standing by itself, does not prove that demand by a preponderance of evidence, and certainly does not prove that McNab ever obtained control. Other witnesses testified only that McNab felt KCPLP was being poorly managed and requested a change in the management structure which would give him more input opportunities. As stated, KCPLP's demise was caused not by Leighton cessation of funding, but by mismanagement and a capital gains problem that, incredibly, was not foreseen. McNab and Leighton acted within their rights to foreclose after numerous defaults remained unsatisfied.

At one point during hearing on the motion for judgment on partial findings, counsel for the Trustee candidly described the project created by Groesbeck substantially as a pyramid scheme. Indeed, the only way KCPLP could have survived was to keep borrowing and paying off loans with new borrowing. However, KCPLP's demise was not caused by Leighton's exercise of its rights under the loan agreement.

Accordingly, the Trustee did not prove elements required in Count IV by a preponderance of evidence.

### Count VII: Inducing Breach of Fiduciary Duty

In Count VII of the First Amended Complaint, the Trustee alleges that McNab induced both Rios and Schabes to breach their fiduciary duty to the Debtor. The Trustee alleges that McNab colluded with both Rios and Schabes to induce their respective breaches of duty to the Debtor and

that he led them to believe that their complicity in the Commons project would inure to their respective benefit in connection with future unrelated business activities with McNab.

 "Under Illinois law, a third party who knowingly participates in or induces a breach of duty by an agent is liable to the person to whom the duty was owed. The third party must also obtain a benefit from the breach." *In re Salem Mills, Inc.,* 881 F.Supp. 1109, 1116 (N.D.Ill.1995) (internal citations omitted). That third party can be held jointly and severally liable for the breach. *Id.* (citing *Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 668–69, 494 N.E.2d 785, 790–91 (1st Dist.1986)). However, a vital element of inducing a breach of fiduciary duty is that the third party conspired with the fiduciaries. *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 542 (7th Cir.1991).

Rios and Schabes were shareholders, officers, and directors of Mainstream as well as limited partners of Debtor. Rios also acted as the attorney for Debtor as to matters in Chicago dealing with Leighton. Thus, both Rios and Schabes had fiduciary duties to Mainstream and Debtor. However, the Trustee did not prove any collusion or conspiracy between McNab, Rios and Schabes. While it is true that McNab and Rios spoke frequently during the project, the evidence also showed that McNab and Rios were longtime friends, and McNab often stayed with Rios when he visited Chicago. The evidence did not establish that these phone calls and meetings were part of any grand scheme to launch a coup against Groesbeck. Indeed, it was not even established that Schabes was ever part of these conversations.

Hudson did testify that Rios accompanied Connor when Connor delivered the default notice. But to argue from such that Connor and Rios were in cahoots in some invidious scheme is too far a leap. There was further testimony from Hudson that Rios ignored advice from KCPLP's business advisor and disclosed the existence of the Camp and Sourlis notes to McNab so as to provide McNab with additional pretexts upon which to issue a default. However, the essential point of fact was that Groesbeck failed to fully disclose financial information to McNab in violation of the loan agreement and McGhee did not want McNab to find out about that failure.

The Trustee did not prove that McNab breached any fiduciary duty or that he acted in improper collusion with Rios.

### CONCLUSION

The Trustee failed to meet his burden of proof at trial in Counts I, II, III, IV, and VII of this adversary proceeding. Pursuant to Fed.R.Civ.P. 52(c) (Fed.R.Bankr.P. 7052), it is appropriate to enter judgment in favor of the Defendants at this time.

For reasons set forth above and by separate orders, individual judgments will be entered in favor of Defendants Leighton and McNab on Counts I, II, III, IV, and VII.